881 F.2d 1184
 58 USLW 2090
 AMERICANS DISABLED FOR ACCESSIBLE PUBLIC TRANSPORTATION
(ADAPT); Disabled in Action of Pennsylvania; The Coalition
of Active Disabled of Chester County; The Chicago Council
for Disability Rights; The Maryland Alliance of Advocates
with the Handicapped; The Wisconsin Disability Coalition;
Tulsans for Accessible Public Transit; The North Carolina
Alliance of Disabled; The Maine Association of Handicapped
Persons; ADAPT of Cleveland; The Coalition of Texans with
Disabilities; ADAPT-West on behalf of their members; and
Joyce Brock; Michael Landwehr; Susan Deis; Stephanie Cris
Matthews; Walter S. Place; Stephen Margolis; Wendy Elliott-Vandivier
v.
Samuel K. SKINNER, Secretary of Transportation. (Two Cases)
EASTERN PARALYZED VETERANS ASSOCIATION, INC., and James J. Peters
v.
Samuel K. SKINNER, Secretary of Transportation, Appellant in
No. 88-1139.
EASTERN PARALYZED VETERANS ASSOCIATION, INC., and James J. Peters
v.
Samuel K. SKINNER, Secretary of Transportation. (Two Cases)
Appeal of AMERICANS DISABLED FOR ACCESSIBLE PUBLIC
TRANSPORTATION (ADAPT), et al., in No. 88-1177.
AMERICANS DISABLED FOR ACCESSIBLE PUBLIC TRANSPORTATION
(ADAPT); Disabled in Action of Pennsylvania; The Coalition
of Active Disabled of Chester County; The Chicago Council
for Disability Rights; The Maryland Alliance of Advocates
with the Handicapped; The Wisconsin Disability Coalition;
Tulsans for Accessible Public Transit; The North Carolina
Alliance of Disabled; The Maine Association of Handicapped
Persons; ADAPT of Cleveland; The Coalition of Texans with
Disabilities; ADAPT-West on behalf of their members; and
Joyce Brock; Michael Landwehr; Susan Deis; Stephanie Cris
Matthews; Walter S. Place; Stephen Margolis; Wendy Elliott-Vandivier
v.
Samuel K. SKINNER, in his capacity as Secretary of Transportation.
Appeal of EASTERN PARALYZED VETERANS ASSOCIATION OF
PENNSYLVANIA, INC. ("EPVA") and James J. Peters,
 in No. 88-1178.
 Nos. 88-1139, 88-1177 and 88-1178.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 5, 1988.
Reargued In Banc May 15, 1989.
Decided July 24, 1989.
 
 Timothy M. Cook (Argued), Frank J. Laski, Lisa M. Rau, Philadelphia, Pa., Stephen F. Gold, Philadelphia, Pa., for appellant and cross-appellee Americans Disabled for Accessible Public Transp. (ADAPT).
 Jeffrey Clair (argued), Peter R. Maier, Michael J. Singer, Mark Stern, U.S. Dept. of Justice Appellate Staff, Civ. Div., Washington, D.C., for appellee and cross-appellant Secretary of Transp.
 Richard M. Zuckerman, James D. Fornari (argued), Jarblum, Solomon & Fornari, P.C., New York City, for appellants and cross-appellees Eastern Paralyzed Veterans Ass'n of Pennsylvania and James J. Peters.
 Peter S. Greenberg, Joyce S. Meyers, Schnader, Harrison Segal & Lewis, Philadelphia, Pa., for appellant and cross-appellee Eastern Paralyzed Veterans Ass'n, Inc.
 Argued Oct. 5, 1988.
 Before HIGGINBOTHAM, MANSMANN, and GREENBERG, Circuit Judges.
 Reargued In Banc May 15, 1989.
 Before GIBBONS, Chief Judge, and SEITZ, HIGGINBOTHAM, SLOVITER, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, and NYGAARD, Circuit Judges.
 OPINION ANNOUNCING THE JUDGMENT OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 This case, before us on consolidated cross-appeals from the judgment of the district court, requires us to construe a welter of statutory provisions establishing the obligations of recipients of federal financial assistance to provide accessible public transportation for the handicapped. The statutory provisions involved are section 16(a) of the Urban Mass Transportation Act ("UMTA"), 49 U.S.C.App. Sec. 1612(a) (1982); section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Sec. 794(a) (1982 & Supp. V 1987 & West Supp.1989); section 165(b) of the Federal-Aid Highway Act, 23 U.S.C. Sec. 142 note (1982) (Bus and Other Project Standards); and section 317(c) of the Surface Transportation Assistance Act of 1982 ("STAA"), 49 U.S.C.A.App. Sec. 1612(d) (West Supp.1989) (originally codified at 49 U.S.C.App. Sec. 1612(c) (1982)). The principal question before us is whether certain regulations promulgated by the Department of Transportation ("DOT") at 49 C.F.R. Sec. 27.95 & 27.97 (1987), delineating local transit authorities' obligations to meet the needs of the disabled, are in compliance with these statutes. The regulations were challenged by seven disabled individuals and twelve organizations, who brought one of the consolidated actions on behalf of themselves and their mobility-impaired members ("ADAPT"), on the grounds that they were in derogation of the applicable statutes.
 
 
 2
 The first challenged regulation, 49 C.F.R. Sec. 27.95 (1987), gives local governments the option to effectuate the purposes of the statutes through either accessible mass transit, paratransit,[1] or a combination of both. The district court concluded that the regulation was not an arbitrary and capricious exercise of delegated authority and granted summary judgment for the defendant Secretary of Transportation on this issue. Contending that the law requires mainline accessibility, or "mainstreaming," and that the regulations' paratransit-only option obviates that requirement, ADAPT appeals, No. 88-1177.
 
 
 3
 The other challenged regulation, 49 C.F.R. Sec. 27.97, is a safe harbor provision insulating transit operators that spend 3% of their average operating costs from further liability under the statutes. The district court granted summary judgment for the plaintiffs on this issue, holding that the safe harbor was arbitrary and capricious. The district court set the regulation aside and remanded for further consideration by the Secretary. The Secretary, contending that the safe harbor provision was necessary to keep expenditures for transportation for the disabled within reasonable bounds, as mandated by the statutes, appeals, No. 88-1139.[2]
 
 
 4
 For the reasons that follow, we will affirm, though on remand we will require the district court to set a timetable for the Secretary's further rulemaking.
 
 I. STATUTORY AND REGULATORY HISTORY
 
 5
 The first of the relevant statutes to be enacted was the Urban Mass Transportation Act of 1964, amended by Congress in the Urban Mass Transportation Assistance Act in 1970. The Act provides for federal financial assistance to local transit operators. The 1970 amendments added section 16(a), which declared a national policy that
 
 
 6
 elderly and handicapped persons have the same right as other persons to utilize mass transportation facilities and services; that special efforts shall be made in the planning and design of mass transportation facilities and services so that the availability to elderly and handicapped persons of mass transportation which they can effectively utilize will be assured....
 
 
 7
 49 U.S.C.App. Sec. 1612(a).
 
 
 8
 Subsequently, Congress passed section 504 of the Rehabilitation Act of 1973, commonly known as the civil rights bill of the disabled. Section 504, which was introduced by Senators Humphrey and Percy as an amendment to the Civil Rights Act of 1964, provides that:
 
 
 9
 No otherwise qualified individual with handicaps in the United States ... shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
 
 29 U.S.C. Sec. 794(a).[3]
 
 10
 Congress then enacted section 165(b) of the Federal-Aid Highway Act of 1973, which directed that
 
 
 11
 [t]he Secretary of Transportation shall require that projects receiving Federal financial assistance ... shall be planned, designed, constructed, and operated to allow effective utilization by elderly and handicapped persons who, by reason of illness, injury, age, congenital malfunction, or other permanent or temporary incapacity or disability ... are unable without special facilities or special planning or design to utilize such facilities and services effectively.... The Secretary shall not approve any program or project to which this section applies which does not comply with the provisions of this subsection requiring access to public mass transportation facilities, equipment, and services for elderly or handicapped persons.
 
 
 12
 23 U.S.C. Sec. 142 note.
 
 
 13
 To implement these statutory mandates, DOT promulgated regulations in 1976 requiring local planners to make " 'special efforts' in planning public mass transportation facilities and services that can effectively be utilized by elderly and handicapped persons." 41 Fed.Reg. 18,234 (1976).
 
 
 14
 Moreover, two days before the regulations were published, then-President Gerald Ford issued Executive Order Number 11,914, 41 Fed.Reg. 17,871 (1976), directing the Department of Health, Education, and Welfare ("HEW") (now the Department of Health and Human Services, see 20 U.S.C. Sec. 3508 (1982)), to coordinate implementation of the non-discriminatory policy announced in section 504 for all federal agencies.
 
 
 15
 HEW's guidelines, issued in 1978, required all recipients of federal funds to mainstream handicapped persons by making public transportation "readily accessible to and usable by handicapped persons." 45 C.F.R. Secs. 85.57(a), 85.58(a) (1978). The HEW guidelines stressed that participating programs should authorize those options offering access "in the most integrated setting appropriate." 43 Fed.Reg. 2132, 2138 (1978). With respect to public transportation, the HEW guidelines specifically required retrofitting of subways and buses to make these modes of transportation fully accessible to the disabled. 45 C.F.R. Secs. 85.57(b), 85.58.
 
 
 16
 Importantly, even though the language of HEW's guidelines appeared to require mainstreaming, HEW was careful not to preclude the possibility of paratransit. HEW stated that it "wish[ed] to make clear that it does not construe [the guidelines] to preclude in all circumstances the provision of specialized services as a substitute for, or supplement to, totally accessible services." 43 Fed.Reg. at 2134.
 
 
 17
 In 1979, DOT promulgated regulations in compliance with the HEW guidelines. Those regulations contained requirements mandating across-the-board alterations to ensure that all transportation facilities were made accessible to handicapped persons. 44 Fed.Reg. 31,442 (1979). The 1979 regulations, accordingly, were viewed as requiring transit operators to retrofit their existing systems to make them accessible to the handicapped.
 
 
 18
 The 1979 regulations were immediately challenged by the American Public Transit Association, a trade association of public transit operators. In American Public Transportation Association (APTA) v. Lewis, 655 F.2d 1272 (D.C.Cir.1981), the Court of Appeals for the District of Columbia Circuit invalidated the retrofitting requirements as inconsistent with section 504. APTA v. Lewis, 655 F.2d at 1278. The court found that compliance would require extensive modifications to existing systems and would impose heavy financial burdens on local transit authorities. The court remanded and directed DOT to determine whether other statutes could support the extensive requirements of the regulations.
 
 
 19
 Subsequent to APTA v. Lewis, DOT promulgated interim regulations. 46 Fed.Reg. 37,488 (1981) [hereinafter 1981 Interim Regulations]. Pursuant to these regulations, recipients of federal funds were required to make "special efforts" to accommodate the transportation needs of the handicapped but could elect under "local option" provisions how to do so. Local transit operators were to opt whether (1) to make their buses accessible by the installation of wheelchair lifts; (2) to establish a paratransit system, separate from the regular transit system, using vans that could accommodate wheelchairs; or (3) to establish a mixed system, using accessible buses for some parts of the system and paratransit for other parts. The 1981 Interim Regulations also contained a safe harbor: transit operators would be relieved of their obligation to provide transportation services to the handicapped as long as they spent 3 1/2% of UMTA funds on such services. Under the regulations, once the spending requirement was met, there would be no federal scrutiny of the extent of the transportation services provided to the handicapped.
 
 
 20
 Then, in January of 1982, DOT announced a notice of proposed rulemaking. 47 Fed.Reg. 1890, 1891 (1982). Noting the 3 1/2% safe harbor provision, DOT observed that without any substantive criteria, the quality of the transportation services offered handicapped persons might be inconsistent or quite low in some geographical areas. DOT stated it was considering three alternative approaches, each of which would allow local transit authorities discretion to determine the type of service they would offer.
 
 
 21
 Apparently dissatisfied with the slow pace of DOT's rulemaking, Congress, in December of 1982, enacted the Surface Transportation Assistance Act of 1982, 49 U.S.C.A.App. Sec. 1612(d), which requires that DOT issue regulations to establish minimum criteria for the provision of services to the disabled.[4] In fact, when the provision of STAA ordering DOT to establish the minimum service criteria was proposed by Senator Cranston, he criticized the 1981 Interim Regulations as "a total abdication of Federal responsibility for protecting handicapped persons from discrimination and inadequate services." 128 Cong.Rec. 30,822, 30,824 (1982); see also 128 Cong.Rec. 32,634, 32,642 (1982) (Sen. Riegle saying same). Senator Cranston underscored the need for the provision as follows:
 
 
 22
 [A] most unfortunate situation [exists] in which the Department of Transportation's hands-off, local-option, self-certification, no-monitoring, and no-criteria position is transforming the antidiscrimination laws into meaningless symbols. And it is not just that accessible bus service is fast becoming a lost hope in many parts of the country; the special services--paratransit--for handicapped persons are proving to be unsatisfactory.
 
 
 23
 The present course is clearly not the answer. Not only are we headed toward affording handicapped and elderly persons third-class treatment, but we are frustrating our own efforts to rehabilitate people, help them get back into productive activities, be more independent, and get off of disability and welfare rolls. Mobility is certainly critical to these efforts, and it is a tragic waste to fund vocational rehabilitation programs and then frustrate those rehabilitation efforts by failing to insure that we continue to make progress in enabling disabled persons to find and to get to and from work.
 
 
 24
 128 Cong.Rec. at 32,643.
 
 
 25
 On September 8, 1983, DOT published a second notice of proposed rulemaking to replace the 1981 Interim Regulations. See 48 Fed.Reg. 40,684 (1983). The proposed regulations would continue to allow local transit systems to select how they would provide for the transportation needs of the handicapped. However, in contrast to the 1981 Interim Regulations, the 1983 proposed regulations would have established six service criteria that special transit systems were required to meet.
 
 
 26
 The next step in the rulemaking process proceeded from the case of Maine Association of Handicapped Persons v. Dole, 623 F.Supp. 920 (D.Me.1985), in which the district court criticized the Secretary's "unimaginably leisurely pace" in promulgating the final regulations and entered an order directing that the regulations be issued. 623 F.Supp. at 926. On May 20, 1986, the Secretary published the regulations at issue here. See 51 Fed.Reg. 18,994 (1986). Subpart E of the regulations maintains a local option provision and establishes minimum service criteria for handicapped persons for the three different types of transportation services: accessible bus, paratransit, and a combination of the two. The minimum service criteria for each of the available options take into account: (1) nondiscriminatory eligibility; (2) maximum response time; (3) no restrictions or priorities based on trip purpose; (4) comparable fares to those for the general public; (5) comparable hours and days of service; and (6) comparable service area. See 49 C.F.R. Sec. 27.95.
 
 
 27
 After setting forth the detailed service criteria, Subpart E sets forth the current safe harbor provision:
 
 
 28
 (a) Calculation. To determine its limit on required expenditures for a given fiscal year, the recipient shall calculate 3.0 percent of its total annual average operating costs (as reported to UMTA in compliance with requirements under section 15 of the Urban Mass Transportation Act, as amended) it reasonably expects to incur in the current fiscal year and did incur during the previous two fiscal years.
 
 
 29
 (b) Effect. A recipient is not required, in any fiscal year, to spend more than the amount of its limit on required expenditures that fiscal year in order to comply with this subpart, even if, as a result, the recipient cannot provide service to handicapped persons that fully meets the service criteria specified by Sec. 27.95(b), (c) or (d), as applicable. Each recipient shall, in all cases, comply with Sec. 27.95(b)(1) or (c)(3)(i), as applicable.
 
 
 30
 49 C.F.R. Sec. 27.97(b).
 
 II. THE CURRENT ACTION
 
 31
 In its complaint for declaratory and injunctive relief, ADAPT requested the district court to vacate Subpart E of the Department of Transportation's 1986 regulations, alleging that Subpart E's local option provisions unlawfully permitted recipients of federal transportation systems to exclude handicapped persons from effective and meaningful access to federally-assisted transit systems. ADAPT further attacked the regulations on the ground that the provision excusing full compliance with federal disability rights statutes beyond expenditures of 3% of operating costs was invalid.
 
 
 32
 In its complaint, ADAPT contended that denial of accessibility resulted in confinement of its members to segregated specialized transportation facilities, increased the burden of obtaining employment, education and meeting other essential needs, restricted opportunities to take part in cultural, social and community activities, and abridged the opportunity to exercise guaranteed constitutional rights.
 
 
 33
 In addition to its contention that the regulations were promulgated in violation of the enumerated transportation statutes described above, ADAPT charged that the challenged regulations violated section 10(e) of the Administrative Procedure Act, 5 U.S.C. Sec. 706 (1982). ADAPT claimed that the rules were promulgated in bad faith, without sufficient factual basis, without adequate explanation, without sufficient consideration of reasonable alternatives, and hence, in an arbitrary and capricious manner.
 
 
 34
 On cross-motions for summary judgment, the district court held that DOT could reasonably conclude that Congress has not legislated mainstreaming the disabled into public transportation. The court thus upheld DOT's implementation of a local option policy and granted summary judgment on that issue in DOT's favor. See Americans Disabled for Accessible Public Transportation v. Dole, 676 F.Supp. 635, 640-41 (E.D.Pa.1988) (Katz, J.).
 
 
 35
 The district court held, however, that the 3% safe harbor provision was an arbitrary and capricious exercise of delegated power. ADAPT, 676 F.Supp. at 642. The court recognized the agency's responsibility to consider costs in determining what efforts transit providers are to take to accommodate the handicapped. Nonetheless, it found the 3% figure unreasonable on the facts of the administrative record. The district court determined that although DOT may properly take costs into account, it "may not ... abrogate entirely the rights granted by th[e] statutes" by cost considerations. Id. at 641. The court concluded that there was no rational connection between the facts found and the choice made and that the decision to impose the 3% safe harbor provision ran contrary to the evidence before the agency. Therefore, on the challenge to the safe harbor provision, summary judgment was entered in ADAPT's favor. Declining to rewrite the regulations to delete the arbitrary portions, the court remanded the matter to DOT, directing it to formulate regulations resolving the conflicting goals of equality for the handicapped and cost efficiency.[5] As noted above, both sides appealed.[6]
 
 III. VALIDITY OF THE LOCAL OPTION PROVISION
 
 36
 A. Is Mainstreaming Required?
 
 
 37
 The threshold question is whether mainstreaming is required by the relevant federal statutes. None of the statutes at issue expressly require local transit authorities to provide mainstreaming for mobility-impaired individuals. While some portions of the legislative history support a mainstreaming requirement, there is also much evidence of congressional opposition to mainstreaming and a preference for local option. The Supreme Court has held that "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Given the breadth of the Secretary's discretion to fashion appropriate minimum criteria for handicapped services, we must accord particular deference to the standards set forth in the challenged regulations. The Secretary struck a balance between preserving local discretion, avoiding the imposition of unduly burdensome costs, and ensuring adequate transportation services for the handicapped. If this balance represents a permissible reading of the statutes, the regulations must be upheld even if we would have struck a different balance in the absence of the regulations. See Chevron, 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11.
 
 1. Section 504 of the Rehabilitation Act
 
 38
 In attempting to discern what is required by the language of section 504, we must view it in light of two countervailing legislative concerns: (1) effectuation of the statute's objectives of assisting the handicapped; and (2) the need to impose reasonable boundaries in accomplishing this purpose. See Alexander v. Choate, 469 U.S. 287, 299, 105 S.Ct. 712, 719, 83 L.Ed.2d 661 (1985). The Supreme Court first considered the balance between these considerations in Southeastern Community College v. Davis, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). In Davis, a deaf plaintiff, denied entry to a nursing school because she could not participate in the nursing program without full-time supervision, alleged that the school's admission decision violated section 504. On review, the Court determined that section 504 requires that an "otherwise qualified handicapped individual" must be provided with meaningful access to benefits that a federal fund grantee offers. The Court defined the phrase "otherwise qualified" as "one who is able to meet all of a program's requirements in spite of his handicap." 442 U.S. at 406, 99 S.Ct. at 2367.
 
 
 39
 The Court carefully circumscribed its mandate that otherwise qualified individuals may not be treated differently by holding that section 504 does not compel fundamental alteration to programs receiving federal assistance since such radical adjustments would constitute an "unauthorized extension of the obligations imposed by [Sec. 504]." Id. at 410, 99 S.Ct. at 2369. The Court then concluded that "neither the language, purpose, nor history of Sec. 504 reveals an intent to impose an affirmative-action obligation on all recipients." Id. at 411, 99 S.Ct. at 2369.
 
 
 40
 The Court found that Southeastern's physical qualification requirement for its nursing program was legitimate and that to change it would alter the fundamental nature of the program. Since Davis could not meet this requirement, she was not otherwise qualified under section 504 and Southeastern's decision to exclude Davis was not discriminatory.
 
 
 41
 The Court clarified Davis in Alexander v. Choate, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). Challenged in Choate was a state's proposal to impose a limitation on the number of annual in-patient hospital days for which state Medicaid would reimburse hospitals on behalf of Medicaid recipients. A class of disabled Medicaid recipients argued against the 14-day limitation, asserting that the proposal's implementation would have a disproportionately adverse impact on the disabled in violation of section 504. As in Davis, the Court held that the proposal did not preclude meaningful access to or exclude the handicapped from Medicaid services in a way that violated section 504. The Court amplified its Davis holding and stated that federally-funded programs were required to make reasonable modifications to accommodate the disabled. The Court interpreted section 504 as imposing two limitations on the duty to accommodate.
 
 
 42
 It clearly enunciated the first limitation that accommodations necessitating fundamental or substantial changes to the nature of the program were not mandated. The second, concerning the extent of expenditures required to effectuate the alteration, was not as fully delineated. As the Court explained, "[t]he balance struck in Davis requires that an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers." Choate, 469 U.S. at 301, 105 S.Ct. at 720; see Davis, 442 U.S. at 405-06, 99 S.Ct. at 2366-67. In both Choate and Davis, the Court recognized that where handicapped persons' needs can be accommodated without imposing undue financial or administrative burdens, the refusal to make necessary modifications might become unreasonable and discriminatory. See Choate, 469 U.S. at 301, 105 S.Ct. at 720; Davis, 442 U.S. at 412-413, 99 S.Ct. at 2370. In both cases, however, the Court refused to mandate the modifications sought because they were "substantial." See Choate, 469 U.S. at 308-09, 105 S.Ct. at 724; Davis, 442 U.S. at 413-14, 99 S.Ct. at 2370-71. Choate and Davis therefore contemplate a continuum in which some modest modifications may be necessary to avoid discrimination but other more substantial modifications are not required by section 504.
 
 
 43
 In its final rulemaking, DOT characterized Choate as an elaboration of the "undue burden" standard announced in Davis. See 51 Fed.Reg. 18,996 (1986). DOT noted that although Choate was decided after the expiration of the comment period on the proposed regulation, DOT would have entertained additional comments on the impact of Choate had it believed it necessary to do so. DOT, however, construed the holding in Choate as consistent with Davis to the extent that if accommodations entail extensive costs and administrative burdens, the refusal to undertake alterations to a program is not discriminatory. See id.
 
 
 44
 The district court disposed of the reasonable accommodation issue by stating that it had reviewed section 504 and concluded that Congress has not yet legislated mainstreaming for the disabled in public transportation. ADAPT, 676 F.Supp. at 639 ("Congress has not yet legislated equality for the handicapped regardless of cost"). The district court then upheld the validity of Subpart E's local option provision.
 
 
 45
 Neither Supreme Court precedent nor section 504 on its face addresses the extent to which federally-funded transportation programs are required to make physical modifications to accommodate disabled people. However, every federal court that has addressed the question whether mainstreaming in public transit is required has concluded that section 504 does not mandate mainstreaming. See, e.g., Rhode Island Handicapped Action Committee v. Rhode Island Public Transit Authority, 718 F.2d 490, 494-99 (1st Cir.1983); American Public Transportation Association v. Lewis, 655 F.2d 1272, 1277-78 (D.C.Cir.1981); Disabled in Action of Baltimore v. Bridwell, 593 F.Supp. 1241, 1250-52 (D.Md.1984), appeal dismissed, 820 F.2d 1219 (4th Cir.1987).
 
 
 46
 The difficulty in determining precisely the extent of accommodation mandated by section 504 is illustrated by the history of the regulations intended to implement section 504. As previously discussed, the regulations were subject to much revision prompted either by executive, legislative or judicial pressures.
 
 
 47
 In the absence of a clear congressional mandate, the Supreme Court's decision in Chevron, 467 U.S. 837, 104 S.Ct. 2778, requires us to defer to an agency's interpretation of the relevant statute in its regulations. The regulations we consider today were enacted pursuant to a broad delegation of discretion under statutory standards that this Court has previously characterized as ambiguous at best. See Disabled in Action of Pennsylvania v. Sykes, 833 F.2d 1113, 1117 (3d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1293, 99 L.Ed.2d 503 (1988). Applying the Davis/Choate standard, we conclude that section 504 does not mandate mainstreaming.
 
 2. The Urban Mass Transportation Act
 
 48
 Nothing in the plain language of section 16(a) of UMTA suggests that Congress has mandated mainstreaming. While portions of the pertinent legislative history support ADAPT's position,[7] a thorough reading of the statutory text and the legislative history suggests that Congress gave the Secretary broad discretion to address the transportation problems of the handicapped rather than requiring one particular solution, i.e., mainstreaming.
 
 
 49
 Section 16(a) expresses a clear intent to increase the accessibility of federally assisted mass transportation. It speaks, however, in broad and general terms that cannot fairly be construed as establishing particular standards or mandating a particular federal policy. Section 16(a) requires only that federally assisted programs make "special efforts" to ensure that the handicapped can effectively utilize transportation services. It requires that the handicapped be able to utilize mass transportation systems, but does not explicitly or implicitly mandate the means by which mass transportation must be made available to the handicapped. Under the common understanding of the phrase, it is surely possible to conclude that a community has made "special efforts" to ensure that the handicapped may use mass transportation facilities and services even if those efforts do not actually enable the handicapped to fully exploit each of those facilities and services. Because section 16(a) does not unequivocally require the Secretary to implement mainline accessibility, Congress apparently left the Secretary broad discretion to map out the contours of an appropriate federal policy.
 
 
 50
 Every federal court that has squarely addressed the contention that section 16(a) mandates mainstreaming has held that it does not. See, e.g., Rhode Island Handicapped Action Committee, 718 F.2d at 497, 499 (finding that section 16(a) provided no "legislative standards to guide a court in this area" and concluding that guidance on the appropriate implementation of the statute must come from the Secretary); Atlantis Community, Inc. v. Adams, 453 F.Supp. 825, 831 (D.Colo.1978) ("In [UMTA and Sec. 504], Congress said do something for the mobility handicapped and left it to the Secretary to determine what that something should be.... [T]he federal statutes ... do not provide a sufficient definition of the duties of the federal [transportation officials] to give direction to them."); Vanko v. Finley, 440 F.Supp. 656, 660 (N.D.Ohio 1977) (rejecting "plaintiff's contention that [section 16(a) ] requires that 'all transit rolling stock and facilities [must be able to be] effectively utilized by all mobile disabled and elderly people' " and finding no "statutory infirmity in ... the operation of a separate paratransport system parallel to the main bus and rapid systems"); see also American Public Transit Association v. Goldschmidt, 485 F.Supp. 811, 823 (D.D.C.1980) (generality of congressional expression in UMTA and Sec. 504 establishes broad delegation of authority; "law, the heterogenous character of the handicapped population, the breadth and variety of the states and communities affected, and the uncertain and changing technology available preclude a Congressional prescription of the particular means for carrying out its policy"), rev'd on other grounds sub nom. APTA v. Lewis, 655 F.2d 1272 (D.C.Cir.1981).
 
 
 51
 In light of UMTA's broad language, which clearly does not define the ways in which UMTA was to be effected, we also conclude that section 16(a) of UMTA does not mandate mainstreaming, but rather grants wide latitude to the Secretary to determine how best local governments are to comply with the mandates of UMTA.
 
 3. The Federal-Aid Highway Act
 
 52
 Although ADAPT raised the issue below, the district court reached its conclusion that Congress has not ordered mainstreaming of the disabled without commenting on section 105(b) of the Federal-Aid Highway Act. We hold what is implicit in the district court's silence, that the Federal-Aid Highway Act does not speak to whether mainstreaming is required.
 
 
 53
 Section 105(b) of the Federal-Aid Highway Act, amending section 165(b) of the Federal-Aid Highway Act of 1973, provided that DOT must require that "projects" funded pursuant to particular provisions of the Federal-Aid Highway Act be "planned, designed, constructed, and operated to allow effective utilization by ... handicapped persons." 23 U.S.C. Sec. 142 note. The "projects" included within the purview of section 165(b) include "construction" of "high occupancy vehicle lanes, highway traffic control devices, bus passenger loading areas and facilities ... and fringe and transportation corridor parking facilities," the "purchase of buses," and the "construction, reconstruction, and improvement of fixed rail facilities including ... rolling stock." 23 U.S.C. Sec. 142(a) (incorporated by reference into 23 U.S.C. Sec. 142 note). DOT acknowledges that this amendment expressed a clear intention of requiring increased accessibility to mass transit. DOT, however, argues persuasively that the amendment did not mandate mainstream accessibility.
 
 
 54
 With regard to this amendment, the Senate Report stated:
 
 
 55
 The bill contains a statement of national policy which is similar to that found in Section 16(a) of the Urban Mass Transportation Act of 1964, as amended, and which declares that elderly and handicapped persons have the same right to utilize mass transportation systems as other persons. This amendment goes further than the Urban Mass Transportation Act, however, permitting the Secretary to approve only those programs or projects which comply, to the maximum extent feasible, with the provisions of this subsection.
 
 
 56
 S.Rep. No. 1111, 93d Cong., 2d Sess. 8 (1974) (emphasis added). The amendment may have been intended to "go[ ] further than [UMTA]," id., in the sense that it added the enforcement mechanism of requiring DOT to withhold approval where certain new federally-funded facilities, buses and rolling stock were not made accessible, but it continued to emphasize that efforts of accommodation are to be limited by feasibility, and we understand feasibility to include financial, engineering and physical plant considerations.
 
 
 57
 By its terms, the Federal-Aid Highway Act does not speak to whether a system as a whole must be accessible. The text of the act, see supra at 1194, directs the Secretary to require that projects, including buses, purchased with certain federal funds, be designed and operated to allow effective utilization by the handicapped. It thus arguably requires that certain funds appropriated for projects involving the areas that serve as ingress and egress to transportation be spent on accessible projects and that new buses and rolling stock be accessible. It does not speak to what is required of existing systems. Insofar as a system, whether it is fully accessible, paratransit-oriented, or a combination, gets funds for these new facilities or purchases new buses and rolling stock pursuant to the statutory provisions listed in section 165 of the Federal-Aid Highway Act, that Act may require those new additions to be accessible.[8] However, section 165 does not indicate whether existing systems may incorporate paratransit services or provide transportation to the handicapped solely through paratransit. Section 165 thus does not speak to the issue of mainstreaming, but only to new purchases. It therefore does not undermine the Secretary's interpretation of the transportation acts in Subpart E.[9] See infra at 1197-99.
 
 
 58
 4. The Surface Transportation Assistance Act of 1982
 
 
 59
 Section 317(c) of STAA, 49 U.S.C.A.App. Sec. 1612(d), was enacted to require a more active federal role in the development and enforcement of substantive standards for serving the handicapped in federally-assisted mass transit programs. The statute gives the Secretary extremely broad discretion to adopt appropriate standards for handicapped services. On its face section 317(c) requires only that the Secretary establish "minimum criteria" for serving the handicapped and does not specify any substantive standard mandating mainline accessibility or otherwise constraining the Secretary's discretion. See 49 U.S.C.A.App. Sec. 1612(d).
 
 
 60
 The legislative history of STAA also demonstrates that Congress did not unambiguously mandate mainstreaming. While this history contains some statements supporting mainstreaming, it also contains contrary statements. Senator Cranston, a co-sponsor of the provision adding section 317(c), stated that "we are not imposing an enormously costly burden for transit systems or requiring an immediate return to the controversial, tough [mainline accessibility regulations] in place before July of 1981." 128 Cong.Rec. at 32,643.
 
 
 61
 Congress was apparently unlikely to approve any effort to compel accessible mainline transit. Senator Cranston stated, when he proposed Sec. 317(c), that
 
 
 62
 [u]ltimately and ideally, I believe that transit systems should be fully accessible to handicapped and elderly persons, including those who must use wheelchairs. However, I recognize that it is not now feasible to gain approval of legislation that would provide a full guarantee of eventual accessibility.
 
 
 63
 128 Cong.Rec. at 30,824. Indeed, the Secretary's 1979 regulations had set out precisely such a policy and were met with severe criticism in Congress. In 1980, both houses of Congress passed bills that would have compelled the Secretary to abandon the compulsory mainline accessibility policy of the 1979 regulations and required the Secretary to permit a "local option." See, e.g., S. 2720, 96th Cong., 2d Sess., Sec. 118; 126 Cong.Rec. 32,197-98 (1980). In the course of considering this legislation, several members of Congress expressed a clear preference for local discretion and paratransit alternatives to mainline accessibility.
 
 
 64
 Senator Exon, for example, stated that "[t]he adoption by the Congress of a local option exemption to section 504 would remedy what I consider the very unfortunate rules and regulations of the Department of Transportation regarding the issue of so-called accessible buses versus special transportation services for the handicapped." 126 Cong.Rec. 16,696 (1980). Similarly, Senator McClure noted that paratransit alternatives offered a feasible and, in some cases, more effective means of providing services than accessible bus service. 126 Cong.Rec. 16,698-16,700 (1980). While these "local option" bills were not enacted into permanent law, the terms of the Senate provisions were incorporated by reference into DOT's 1981 appropriations legislation, thereby barring the Secretary from using any funds to compel bus accessibility in fiscal year 1981. See Pub.L. No. 96-400, Sec. 324, 94 Stat. 1699 (1980).
 
 
 65
 There is nothing in the legislative history that suggests that in enacting section 317(c) of STAA, Congress intended to reverse itself and to foreclose paratransit alternatives to bus accessibility. Indeed, Senator Riegle, a co-sponsor of the provision, suggested that the Secretary could adopt standards governing services that "are not in the form of accessible buses or other equipment serving the general public." 128 Cong.Rec. 32,642-43. Similarly, Senator Cranston noted that rather than alter federal policy on accessibility, the measure would "still retain[ ] the philosophy of granting broad discretion to local systems in the design and implementation of their programs." Id. at 32,644. We conclude that both the statutory language and the legislative history demonstrate that section 317(c) vests the Secretary with the discretion to permit each community to develop paratransit systems or other alternatives to mainline accessibility.
 
 
 66
 Congress adopted section 317(c) of STAA in 1982 to prod DOT into action following the 1981 remand of the regulations in APTA v. Lewis. Accordingly, DOT was directed to promulgate final regulations establishing minimum criteria for the provision of transportation services to the disabled. DOT, in formulating the regulations before us today, found it reasonable to interpret section 317(c) as not requiring that transportation services for the handicapped be the same as or comparable to that provided the general public. 48 Fed.Reg. 40,685 (1983). The district court, relying on its basic premise that mainstreaming has not been legislated, agreed. So do we.
 
 5. Subpart C
 
 67
 We emphasize that we do not reach the issue whether all new purchases by transit authorities must be of accessible buses. We simply hold that the transportation acts do not mandate mainstreaming, or, in other words, the total revamping of a mass-transit system so that it can accommodate the handicapped in the same facilities and on the same terms as other people. ADAPT at no time requested a declaratory judgment that all new purchases must be accessible. Thus we limit our holding to the validity of Subpart E, which by its terms does not speak to new acquisitions, but rather sets the minimum service criteria by which to judge whether transit systems are fulfilling the mandates of the transportation acts.
 
 
 68
 Subpart C of the DOT's regulations provides in relevant part that
 
 
 69
 Each facility ... constructed by, on behalf of, or for the use of a recipient [of financial aid from DOT] shall be designed, constructed, and operated in a manner so that the facility or part of the facility is accessible to and usable by handicapped persons, if the construction was commenced after the effective date of this part.
 
 
 70
 49 C.F.R. Sec. 27.67(a). "Facility" is defined to include "all or any portion of buildings, structures, vehicles, equipment, roads, walks, [and] parking lots." 49 C.F.R. Sec. 27.5.
 
 
 71
 We do not think it appropriate at this time to address the relationship between Subparts C and E. First, the issue was not adequately presented in the district court. In its reply brief to this Court, ADAPT suggests that upholding Subpart E of the challenged regulations would in effect vitiate Subpart C of the regulations, which requires transit authorities to make newly purchased facilities accessible to the handicapped, and therefore E must be struck down. See ADAPT Rep.Br. at 16. However, ADAPT did not request declaratory relief with respect to Subpart C in its complaint in the district court or even in its initial brief to this court. It requested only that the provisions of Subpart E be struck down. See ADAPT Br. at 26-27 ("This appeal challenges only the validity of subpart E...."). Similarly, EPVA has never requested declaratory relief with respect to Subpart C.
 
 
 72
 Moreover, briefing on the relationship between the two subparts has not been significant either in the district court or this Court. And counsel for the Secretary conceded at oral argument that it was a "fair interpretation" to say that the issue of the relationship between the two subparts was not presented to the district court. Although he subsequently stated that this Court should nonetheless address the issue because the relationship was a question of law that was critical to the outcome of the case, as we discuss below, we disagree with that proposition. While acquisition of buses without lifts may be in violation of the transportation acts and Subpart C, it is not a wrong remediable by attack on Subpart E. Subpart E by its terms does not speak of new acquisitions, but rather sets the minimum service criteria by which to judge whether transit systems are fulfilling the mandates of the transportation acts.
 
 
 73
 Second, the issue was not addressed below. "It is the general rule that a federal appellate court does not consider an issue not passed upon below. This rule is one of discretion rather than jurisdiction, and in the past we have heard issues not raised in the district court when prompted by exceptional circumstances." See Selected Risks Insurance Co. v. Bruno, 718 F.2d 67, 69 (3d Cir.1983) (citations omitted). We find no exceptional circumstances in this case justifying a departure from the general rule.
 
 
 74
 Third, we do not believe that the issue is ripe for review. Judge Mansmann, in dissent, argues that, in order to give the statutes their full force, Subpart C must be read to require that all new buses are accessible, and concludes that because there is a potential conflict between Subpart C and the part of Subpart E that allows paratransit only, Subpart E must fall. See post at 1214. However, we believe that it is clearly possible to read the two provisions as independent and consistent requirements. If a municipality purchases no new buses, it would be perfectly permissible under both Subparts for none of the city's buses to be accessible and for the city to rely only on paratransit. See ADAPT Br. at 28 ("Of course, if a transit system chooses not to purchase any new buses, it need not comply with anything in subpart C, and in that event need only comply with the service requirements of subpart E.").
 
 
 75
 It is also not clear that the Secretary will interpret the regulations so as to cause a conflict since it is not clear that the Secretary will allow municipalities to evade the facial mandate of Subpart C on the grounds that they are in compliance with the paratransit only option of Subpart E. In its brief to this Court, the Secretary does take the position that the regulations taken as a whole "did not intend to mandate acquisition of accessible buses." Secretary's Br. at 28. At oral argument on the appeal, the Secretary's counsel, when questioned on the point, contended that compliance with Subpart E excuses compliance with Subpart C. But the fact that the Secretary has taken a litigation position on the matter does not make it ripe for review. See FTC v. Standard Oil Co. of California, 449 U.S. 232, 241-42, 101 S.Ct. 488, 493-94, 66 L.Ed.2d 416 (1980) (agency filing of complaint before administrative law judge not final action and not judicially reviewable because it is not a definitive statement of the agency's position); cf. Bowen v. Georgetown University Hospital, --- U.S. ----, 109 S.Ct. 468, 473, 102 L.Ed.2d 493 (1988) (" 'Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands.' " (citation omitted)). ADAPT does not contend that the agency has made it clear, either through a rule-making or by approving mass transportation plans that comply with Subpart E but not with Subpart C, that the agency's final position is that Subpart E trumps Subpart C.[10]
 
 
 76
 This Court has held that when there is no facial inconsistency between a regulation and a statute there is "no need to anticipate" that the regulation will be applied inconsistently with the statute. In such a case, the regulation is not ripe for judicial review. See Westinghouse Electric Corp. v. NRC, 555 F.2d 82, 92 (3d Cir.1977). That is the situation here. We see no reason to anticipate that the Secretary will apply Subpart E in a way that would undermine Subpart C.
 
 6. Summary
 
 77
 As the preceding examination of the relevant statutes demonstrates, neither in the express language nor in the legislative history of these statutes has Congress expressly mandated mainstreaming or indicated an intention to do so. Instead, the statutes delegate broad powers to the Secretary to promulgate regulations detailing minimum criteria for handicapped services that balance the goals of preserving local discretion, avoiding the imposition of unduly burdensome costs, and ensuring adequate transportation services for the handicapped. The regulations must be upheld if the balance they strike represents a permissible reading of the statutes, even if the court would have struck a different balance in the absence of the regulations. See Chevron, 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11. To this inquiry we now turn.
 
 
 78
 B. Are The Local Option Provisions Arbitrary and Capricious?
 
 
 79
 The district court found that the Secretary's decision to allow communities the option of providing alternatives to accessible bus service is adequately supported by record evidence of the relative costs and benefits. See ADAPT, 676 F.Supp. at 640-41. Much of this evidence is derived from the Secretary's Regulatory Impact Analysis ("RIA"). See 51 Fed.Reg. 18,994. The RIA evaluated the costs and benefits of various service options and was based on two research methods. One method compiled detailed case studies of seven cities selected as representative of the array of possible modes of providing transportation services to the handicapped. See RIA at v-vi. A second method constructed a computer model designed to predict the relative costs of paratransit systems providing a range of alternate levels of service. See RIA at IV-1 to IV-18.
 
 
 80
 The RIA indicated that special services for handicapped persons were likely to be more cost-effective than accessible bus service. Specifically, the Secretary concluded that specialized services would generate more handicapped rides per dollar expended, thereby resulting in lower costs per trip. See RIA at VI-9. This conclusion was reflected in data from both the actual case studies and a computer model. The case studies, for example, indicated that:
 
 
 81
 [L]ift-bus service does not appear to be a particularly cost effective way of meeting the transportation needs of large numbers of disabled persons.... To date, the Seattle Metro bus system has attained the highest lift use rate of any large lift-bus system.... Based on the adjusted cost of the Seattle service, the estimated costs per trip is $16.90. In comparison, the paratransit systems in Cleveland and Pittsburgh are more cost-effective (with cost per trip of $12.06 and $11.95), and serve roughly four times the number of disabled trips as Seattle's liftbuses.
 
 
 82
 RIA at III-6.
 
 
 83
 The computer model produced similar predictions of greater cost effectiveness for specialized services:
 
 
 84
 At a discounted cost-per-trip of $25.00 ... lift-equipped buses are clearly less cost-effective than paratransit services ($11.56 per trip) and are estimated to serve considerably fewer persons as well.
 
 RIA at VI-9 to VI-10.[11]
 
 85
 The higher ridership rates for paratransit services suggest that a system providing only accessible bus service may not fully and adequately serve the handicapped community. Indeed, the Secretary took note of comments in the rulemaking record indicating that
 
 
 86
 not all handicapped persons could use accessible bus service, for reasons such as distance from bus stops, inability to use a lift, physical barriers between the bus stop and the user's origin or destination, bad weather, etc.
 
 
 87
 51 Fed.Reg. at 19,009.
 
 
 88
 Given our narrow scope of review, and the Secretary's conclusion that local discretion in providing handicapped services is essential, 51 Fed.Reg. at 19,004, evidence showing that the paratransit systems already operated by many communities could offer more cost-effective service, while providing advantages that cannot be provided by accessible bus service alone, provides sufficient support for DOT's decision to permit such alternatives. We conclude therefore that the district court correctly held that the provisions permitting paratransit alternatives are a rational exercise of the Secretary's discretion pursuant to the STAA's command to issue minimum criteria.
 
 
 89
 We admit to some discomfort with our conclusion, because ADAPT has forcefully argued that a system that is wholly paratransit results in rather serious restrictions on spontaneous travel for the disabled. The regulations provide for 24-hour response time for paratransit services. See 49 C.F.R. Sec. 27.95(b)(2). Therefore, the disabled may have great difficulty in attending social events or getting to work on short notice where the system is not fully accessible. Despite our unease in the face of these difficulties, neither the language nor the legislative history of any of the acts at issue here justifies a conclusion that DOT has acted arbitrarily and capriciously in promulgating the local option provision. Under current administrative law doctrine, we "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading [we] would have reached if the question initially had arisen in a judicial proceeding." Chevron, 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11. The accommodation of the transit needs of the disabled can only come from Congress or the Secretary.
 
 
 90
 IV. VALIDITY OF THE THREE-PERCENT SAFE HARBOR PROVISION
 
 
 
 [12]
 
 
 
 
 91
 There is no doubt that, in establishing the minimum service criteria required by section 317(c), Congress gave the Secretary the discretion to take compliance costs into account. None of the statutes governing the Secretary's responsibility to ensure that federally assisted transit programs serve the handicapped contains any language that would preclude the Secretary from considering costs. With respect to section 504, as APTA v. Lewis, 655 F.2d at 1278, makes clear, standards that would impose unreasonable cost burdens on local transit operators would exceed the Secretary's authority.[13]
 
 
 92
 The Secretary concluded that a limit on required expenditures was necessary to avoid imposing unduly burdensome modifications and to preserve a community's discretion to choose service options carrying higher overall compliance costs. 51 Fed.Reg. at 18,998-99, 19,011. The district court held that consideration of compliance costs is within the Secretary's discretion. 676 F.Supp. at 641. The current 3% safe harbor provision is not the first safe harbor provision implemented by DOT. In 1976, the regulations established a 5% safe harbor which was decreased to 2% in 1979 and then raised to 3.5% in 1981. See Rhode Island Handicapped Action Committee, 718 F.2d at 497 n. 10.
 
 
 93
 While upholding the local option provision of Subpart E and the minimum service criteria contained therein, the district court struck down the 3% safe harbor provision as arbitrary and capricious and in violation of section 317(c) of STAA. However, the district court decided not to redact the regulations (to delete the portions it found to be arbitrary) or to rewrite them. Unable to conclude that DOT would have adopted the same service criteria absent the 3% provision, the district court remanded the regulations to DOT for "proceedings consistent with its decision."
 
 
 94
 In its cross-appeal, DOT contends that the 3% safe harbor provision of Subpart E is an integral part of the minimum standards developed and that the standards themselves would be impaired necessarily if a cost limit were not applied. DOT also takes the position that the Supreme Court's decisions in Davis and Choate require the safe harbor so that undue financial burdens not be imposed on mass transit agencies. DOT bases its interpretation of the holdings of Davis and Choate essentially on its contention that the statutes governing its responsibility to ensure that the federally-assisted programs serve the disabled do not include language which precludes DOT from taking the cost of accommodation into consideration.
 
 
 95
 A regulation is arbitrary and capricious when the agency fails to "articulate a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.' " Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)). "Normally, an agency rule would be arbitrary and capricious if the agency ... entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." 463 U.S. at 43, 103 S.Ct. at 2867.
 
 
 96
 The district court acknowledged DOT's intended application of the safe harbor provision, which DOT expressed as follows:
 
 
 97
 If the recipient cannot meet the six criteria for the type of service it chooses without exceeding this limit on required expenditures, the recipient may modify its service to keep its expenditures within the limit, after consultation through its public participation process.
 
 
 98
 51 Fed.Reg. at 18,994.[14] However, according to DOT, if the 3% safe harbor were implemented, cities of less than one million people in which the transit authorities implemented a paratransit-only system would virtually never meet all of the applicable service criteria. See 51 Fed.Reg. at 19,01 2 (paratransit-only service "could be provided for less than the cost limit amounts only in cities of more than 1,000,000 population").
 
 The district court explained:
 
 99
 Sec. 317(c) requires the Secretary to establish minimum service criteria for the provision of transportation services to the handicapped, yet the 3% safe harbor cost limitation allows DOT grantees to undercut the Congressional intent of Sec. 317(c) by avoiding compliance with some or all of the service criteria simply by spending a certain percentage of their funds.
 
 
 100
 676 F.Supp. at 641. In effect, under the safe harbor provision, cities could deny to the disabled the minimum quality of service mandated by the Congress with impunity. The Secretary's claim that the 3% safe harbor provision adequately ensures minimum compliance with the transportation statutes therefore runs counter to the evidence before the agency at least with respect to cities of populations below 1,000,000. Immunization from compliance for an entire class of cities was not contemplated by Congress. Therefore, we must conclude that the 3% safe harbor provision is arbitrary and capricious.
 
 
 101
 Judge Greenberg's dissenting opinion concedes that there will be cases in which cities would not meet the minimum service criteria if they failed to spend more than the 3% safe harbor figure on attempting to comply with the criteria. See, e.g., post at 1123-24. Relying on our opinion in Westinghouse Electric Corp. v. NRC, 555 F.2d 82 (3d Cir.1977), however, Judge Greenberg states that such a concern is irrelevant because the instant case involves only a facial challenge to the regulations. See post at 1125-26. In Westinghouse, we held that an NRC regulation concerning the protection of proprietary information was not facially invalid because it was unclear how the rule would be applied in practice and under one possible application the rule would be consonant with the underlying statute. See 555 F.2d at 92. The principle of Westinghouse, that a regulation is not facially invalid when it is unclear if the regulation as applied in practice would violate the underlying statute, is an important one, but it is not relevant to the 3% safe harbor provision at issue in this case.
 
 
 102
 The regulation at issue in the instant case, 49 C.F.R. Sec. 27.97(b), on its face, admits of no uncertainty in application. The regulation states (with clearly delineated exceptions) that a recipient is not required to spend more than the 3% figure. See 49 C.F.R. Sec. 27.97(b) ("A recipient is not required, in any fiscal year, to spend more than the amount of its [3%] limit on required expenditures for that fiscal year in order to comply with this subpart, even if, as a result, the recipient cannot provide service to handicapped persons that fully meets" certain of the service criteria.). Where there is no uncertainty as to how a regulation will be applied, judicial invalidation of a regulation not supported by the administrative record need not wait until the actual application of the regulation. See EPA v. National Crushed Stone Assoc., 449 U.S. 64, 72 n. 12, 101 S.Ct. 295, 301 n. 12, 66 L.Ed.2d 268 (1980) (holding that pre-enforcement review of EPA regulation's validity was not premature since EPA had made clear its final position on how the regulation would be applied).
 
 
 103
 Judge Greenberg relies heavily on 49 C.F.R. Sec. 27.85 to buttress his position that the 3% safe harbor is not facially invalid. See post at 1224-25, 1226-27. That section grants the Secretary discretion to decline to approve a transit operator's proposed service program. Judge Greenberg argues that the Secretary might never approve a program that failed to extend to mobility impaired individuals the level of service that Congress has required and that Subpart E, as a consequence, cannot be facially invalid. See post at 1226.
 
 
 104
 The problem with this argument is that section 317(c) of the STAA expressly requires DOT to promulgate "not later than days after January 6, 1983 ... final regulations ... establishing ... minimum criteria for the provision of transportation services to handicapped and elderly individuals by recipients of" certain federal funds. 49 U.S.C.A.App. Sec. 1612(d). STAA obligates DOT to promulgate a rule that establishes minimum service criteria; a safe harbor provision permits transit operators to comply with Subpart E without meeting DOT's criteria. With respect to the transit operators that take advantage of the 3% safe harbor, the only service criteria that Subpart E establishes is the eligibility standard (that all persons who are physically handicapped and unable to use the recipient's bus service shall be eligible to use the recipient's special service). See post at 1224; 49 C.F.R. Sec. 27.97(b).
 
 
 105
 We believe that with respect to these transit operators (those that take advantage of the 3% safe harbor), DOT will not have complied with the STAA's mandate that it promulgate a regulation establishing minimum service criteria. As the instant case demonstrates, a section that permits the Secretary, on a case by case basis, to evaluate whether a proposed service program "den[ies] mobility impaired individuals the level of service that Congress has required," post at 1226, does not, in our view, comply with the STAA's mandate to "promulgate final regulations ... establishing ... minimum [service] criteria." 49 U.S.C.A.App. Sec. 1612(d). In the instant case, the 3% safe harbor runs afoul of this evil because, as discussed supra at 1201-02, the administrative record indicates that a significant number of transit operators that rely on the 3% safe harbor will not meet the minimum service criteria. Congress mandated a rule establishing minimum service criteria rather than a rule that, in a significant number of cases, leaves it to the Secretary to decide on a case by case basis whether a transit operator's service program is sufficient.[15] Consequently, we believe that Judge Greenberg's reliance on 49 C.F.R. Sec. 27.85 to save Subpart E from facial invalidation is misplaced.
 
 
 106
 We agree with the district court that it is not apparent whether DOT would have issued the identical minimum criteria to implement UMTA, the Federal-Aid Highway Act and the Rehabilitation Act without the 3% safe harbor provision. See ADAPT, 676 F.Supp. at 643 ("I cannot say that the defendant would have adopted the rest of the regulations in their present form, if the arbitrary portions were subtracted, particularly since compliance costs are a legitimate factor for agency consideration."). Therefore, while we will affirm the grant of summary judgment to the plaintiffs, we will remand the case to the district court with instructions that it remand to DOT for further rulemaking consistent with this opinion.
 
 
 107
 EPVA requests that DOT be given a specific timetable in which to formulate conforming regulations. In light of the lengthy delay in implementation of STAA that has already occurred--more than six years have passed since the regulations were supposed to be promulgated--this is a meritorious request. We do not believe, however, that we stand in the best position to determine the most appropriate time frame; rather we will remand to the district court for determination, after consultation with the parties, of an expeditious timetable for promulgation of regulations in conformity with this opinion.
 
 V. CONCLUSION
 
 108
 For the foregoing reasons, the district court's grant of summary judgment to the Secretary on Subpart E's local option provision will be affirmed. Additionally, the district court's grant of summary judgment for the plaintiffs on the safe harbor issue will be affirmed, and the case remanded to the district court for determination, after consultation with the parties, of an expeditious timetable for promulgation of regulations in conformity with this opinion.
 
 
 109
 All members of the Court join in parts I and II of this opinion.
 
 
 110
 GIBBONS, Chief Judge, and COWEN and NYGAARD, Circuit Judges, join in part III of this opinion in its entirety.
 
 
 111
 SEITZ, STAPLETON, GREENBERG, and HUTCHINSON, Circuit Judges, join in parts III-A-1, III-A-2, III-A-4, III-A-6, and III-B of this opinion.
 
 
 112
 GIBBONS, Chief Judge, and SEITZ, A. LEON HIGGINBOTHAM, Jr., SLOVITER, MANSMANN, SCIRICA, COWEN, and NYGAARD, Circuit Judges, join in part IV of this opinion.
 
 
 113
 MANSMANN, Circuit Judge, with whom A. LEON HIGGINBOTHAM, Jr., SLOVITER and SCIRICA, Circuit Judges join, concurring in part and dissenting in part.
 
 
 114
 I agree with the plurality that the Secretary of Transportation is not precluded from establishing "safe harbor" provisions which limit the amount which local transit authorities must expend on transportation services for the mobility-impaired in order to qualify for federal financial assistance. I also agree that despite the leeway afforded the Secretary in these financial matters the particular 3% figure that the Secretary adopted here as a safe harbor was arbitrary and capricious.
 
 
 115
 I dissent, however, from the plurality's governing premise that the four statutes under scrutiny, (Sec. 16(a) of the Urban Mass Transportation Act ("UMTA"), 49 U.S.C.App. Sec. 1612(a) (1982); Sec. 504 of the Rehabilitation Act of 1973 ("Sec. 504"), 29 U.S.C. Sec. 794(a) (1982 & Supp. V 1987); Sec. 165(b) of the Federal-Aid Highway Act ("FAHA"), Sec. 165(b), 23 U.S.C. Sec. 142 note (1982); and, Sec. 317(c) of the Surface Transportation Assistance Act of 1982 ("STAA"), 49 U.S.C.A.App. Sec. 1612(d) (West Supp.1989) (originally codified at 49 U.S.C.App. Sec. 1612(c) (1982)), do not mandate that all newly purchased buses be equipped with wheelchair lifts. I conclude, instead, that the goal of eradicating the "invisibility of the handicapped" led Congress to enact measures to facilitate if not immediate and complete mainstreaming of the handicapped then affirmative aggressive steps in that direction. From the strong directive of Sec. 504 prohibiting discrimination against the handicapped and the language of the transportation statutes enacted and amended from 1970 to 1982, an obvious theme emerges: only a mixed-system of lift-equipped buses for those able to utilize them and a paratransit system for those who cannot will adequately implement the statutory mandates. I have utilized the balancing test fashioned by the Supreme Court in Southeastern Community College v. Davis, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), and Alexander v. Choate, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), and conclude that ordering that newly purchased buses be accessible to the mobility-impaired does not exact a fundamental alteration to the nature of mass transportation. Also, in requiring that newly purchased buses be accessible, I am confident that undue financial or administrative burdens would not be imposed on the local transit authorities.
 
 
 116
 The current DOT final rule, promulgated under the authority of Sec. 504, UMTA, FAHA and STAA, is not an effective enforcement vehicle of Congress' clear mandate of equal accessibility. The local option format discussed in Subpart E of the regulations allows local authorities to choose a paratransit system as the sole means of providing public transportation to the disabled. This permission afforded by Subpart E nullifies the requirement of Subpart C, which is part and parcel of the final rule, that newly purchased buses accommodate the mobility-impaired. Accordingly, Subpart E must be invalidated.
 
 I.
 
 117
 The plurality carefully outlines the statutory and regulatory history of public transportation law[1] and then asks the threshold question of what Congress actually required by these statutes that delineate the rights of the mobility-impaired. The plurality answers this query by concluding that mainstreaming is not mandated, this result being grounded on general principles of agency deference, which I conclude are clearly reduced in this instance because of the many reworkings of the regulations, see Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Company, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), because no other court has interpreted Sec. 504 to require that newly purchased buses must be equipped with wheelchair lifts, and because the broad language of the transportation statutes do not sufficiently outline that mainstreaming is required.
 
 
 118
 If by its statement that the statutes do not expressly require local authorities to mainstream mobility-impaired individuals, the plurality literally meant that the statutes do not explicitly state that new buses must be equipped with wheelchair lifts, then it would be correct. The plurality, however, contends that the statutes do not establish equal rights to utilize mass transportation facilities and services and, with this conclusion, I strongly disagree.
 
 
 119
 I preliminarily address the question of the degree of deference afforded to DOT in scrutinizing the regulations it promulgated. Contrary to the plurality's position, this is not a situation where agency deference is required because the statutes are vague or silent with respect to a specific issue. Here, the greater portion of the legislation at issue reveals a clear intent to equalize transportation opportunities for the mobility-impaired. In these instances of unambiguous congressional aim, Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 845, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984), upon which the plurality places much reliance, compels invocation of a less deferential standard.
 
 
 120
 I do acknowledge that Sec. 504 of the Rehabilitation Act is less than a model of clarity, see Rhode Island Handicapped Action Committee v. Rhode Island Transit Authority, 718 F.2d 490, 494 (1st Cir.1983), ("[Sec. 504] is both ambiguous and lacking in specifics,"), however, UMTA, FAHA and STAA by their direct language mandate equal accessibility to public transportation for the mobility-impaired.[2] UMTA, for example, declares: "[E]lderly and handicapped persons have the same right as other persons to utilize mass transportation facilities and services." 49 U.S.C.App. Sec. 1612 (emphasis added). FAHA dictates that: Federally-supported transportation projects "shall be ... designed so that mass transportation facilities and services can effectively be utilized by elderly and handicapped persons." 23 U.S.C. Sec. 142 note (emphasis added). Finally, STAA orders: Final regulations must be promulgated to establish "minimum criteria for the provision of transportation services to handicapped and elderly individuals by recipients of [federal funds] under ... any provision of law referred to in Sec. 165(b) of the Federal-Aid Highway Act of 1973 [mandating effective utilization]...." 49 U.S.C.App. Sec. 1612(d).
 
 
 121
 We are thus presented with the situation, Sec. 504 excepted, where Congress has directly spoken on the pertinent issue. Because "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent," Chevron, 467 U.S. 837, 843 n. 9, 104 S.Ct. at 2781 n. 9 (citations omitted), I am not here constrained by the breadth of discretion ordinarily afforded to the Secretary's interpretation.
 
 
 122
 With this premise of reduced deference in mind, when appropriate, as did the plurality, I examine each statute in turn.
 
 II.
 A. Section 504 of the Rehabilitation Act
 
 123
 Section 504 of the Rehabilitation Act has been referred to as the cornerstone of the civil rights movement of the mobility-impaired. As the plurality correctly notes, the Supreme Court in Southeastern Community College v. Davis, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), and Alexander v. Choate, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), instructs, albeit without much guidance, that the forceful agitators of Section 504--effectuation of the statute's non-discriminatory objective and the need to impose reasonable boundaries in accomplishing its purpose--must be balanced in ascertaining what is required by the language of the statute. Although the plurality acknowledges the difficulty in discerning the exact accommodations mandated by Sec. 504, it, nonetheless, was able to conclude that Davis and Choate contemplate that "modest modifications" may be necessary. Opinion at 1192.
 
 
 124
 I perceive no basis for the plurality's choice of the modifier "modest" to describe the holdings of Davis and Choate. Nonetheless, even if "modest" modification is indeed proper to describe what these cases require, I believe that the addition of a wheelchair lift would fit into the common definition of that adjective.[3]
 
 
 125
 My discussion of Davis and Choate cannot, however, end here. Although recognizing the imprecise instructions of Davis and Choate, speculation as to the cases' collective meaning can nonetheless be reduced by a practical exercise not undertaken by either the district court or the plurality. I would posit that had the district court, or, likewise the plurality, conducted a Davis analysis of the regulations, i.e., "are disabled persons otherwise qualified to use public buses?", a contrary conclusion concerning Sec. 504 would have been reached.
 
 
 126
 As pointed out by the plurality, the district court addressed this issue of reasonable accommodation in a straightforward manner: it reviewed Sec. 504, uncovered no congressional mandate that public buses be made fully accessible and upheld the validity of Subpart E's local option/minimum service criteria provision. In addition the district court did not address Choate, despite the Supreme Court's indication that a transit agency should modify its operation to some extent in order to permit meaningful access to disabled people unless an alteration would violate one of the Davis limitations. Instead, the district court and the plurality rely upon APTA v. Lewis, 655 F.2d 1272 (D.C.Cir.1981), Rhode Island Handicapped Committee v. Rhode Island Public Transit Authority, 718 F.2d 490 (1st Cir.1983), and Disabled in Action of Baltimore v. Bridwell, 593 F.Supp. 1241 (D.Md.1984), for authority that mainstreaming is not necessary in order to comply with Sec. 504.
 
 
 127
 Reliance upon APTA v. Lewis is misplaced, since its majority opinion emphasized the non-requirement of affirmative action language of Davis, 442 U.S. at 411, 99 S.Ct. at 2369, and did not undertake an "otherwise qualified" analysis. In APTA, the Court of Appeals for the District of Columbia addressed the onerous financial burden imposed by the 1979 regulation requiring retrofitting existing systems and was not focused on the requirement that newly purchased buses be accessible. 655 F.2d at 1277. DOT recognizes this in the preamble to the present regulations: "The Court [in APTA ] said, however, that the 1979 regulation, as applied to mass transit, exceeded the Department's section 504 authority because it required overly costly efforts to modify existing systems." 51 Fed.Reg. 18,994 (1986) (emphasis added).[4]
 
 
 128
 Although I cannot emphatically conclude that the APTA court's statement that: "[A]t some point a transit system's refusal to take modest, affirmative steps to accommodate handicapped persons might well violate section 504," id. at 1278, was a direct reference to a new bus accessibility requirement, I utilize this language as affirmation of the reasonable accommodation mandate of Davis and Choate. Indeed, the applicability of Davis was responded to in the concurring opinion filed in APTA: "[T]he application of section 504 to public transportation systems raises some questions that are significantly different than those considered by the Supreme Court in the higher education setting in [Davis ]...." 655 F.2d at 1281 (Edwards, J., concurring).
 
 
 129
 I find a marked qualitative distinction between the mobility-impaired's utilization of mass transit--a public program that wheelchair users are entitled to use although not practically available--and a deaf student's capability to participate in a nursing program which selects "qualified" applicants. An otherwise qualified individual is one who is able to meet all of a program's requirements in spite of his handicap; certainly a wheelchair user desiring to utilize mass transit fits this definition. Distinctly different from Davis, where a ruling in her favor would have altered the meaning of the accepted level of training which a nurse must undertake, physical modification to a bus to make it accessible would not change the meaning of public transit service.
 
 
 130
 DOT appears to agree. In the preamble to the current rule DOT states that there is "no ... dramatic qualitative difference between an inaccessible bus system and an accessible bus system ... [with] lifts." 51 Fed.Reg. 18,998 (1986). Also, in its 1979 regulations DOT discussed and rejected the points raised by commentators in opposition to the requirement to purchase only accessible new buses. As to the contention that the use of lifts would greatly slow bus service, DOT questioned the magnitude of such a problem. DOT suggested that, given time, the transit systems would gain experience concerning the points on the route most likely to require lift service and could formulate schedules so that "service disruptions or undue slowdowns of service will be minimal." 44 Fed.Reg. 31,457 (1979).
 
 
 131
 Regarding safety concerns, DOT stated that the concern about the fit of the wheelchair and the lifts, i.e., the lifts might not be able to lock onto all sizes of wheelchairs, could be alleviated by either improvements in design or remedial safety devices on the existing lifts. With respect to the potential safety hazard in the event of an emergency evacuation, DOT felt that seating accommodations could be designed to minimize any obstruction a wheelchair might present to evacuation of other passengers. 44 Fed.Reg. 31,457 (1979).
 
 
 132
 The absence of a threat to the safety or other fundamental interests of others if accommodation is made is one additional aspect that distinguishes the position of a handicapped bus rider from that of the plaintiff in Davis.
 
 
 133
 These features of public transit affected, e.g., increased time at stops to assist wheelchair users and additional safety concerns, hardly represent a fundamental change in the nature of the transportation system. I find factual support in a decision from the Court of Appeals for the Second Circuit. In Dopico v. Goldschmidt, 687 F.2d 644 (2d Cir.1982), the court found that the purpose of public bus service is to provide transportation to the general public. It held that physical barriers which prevent wheelchair users from gaining access to mass transit are "incidental to the design of [buses] ... rather than being integral to the nature of public transportation." Id. at 653. The court concluded that requiring modifications does not violate the fundamental nature of mass transit.
 
 
 134
 Rhode Island Handicapped Action Committee v. Rhode Island Public Transit Authority, 718 F.2d at 495, is also distinguishable. In this case, the Court of Appeals for the First Circuit reversed a district court's order that, under the authority of Davis, the new buses purchased by the Rhode Island Transit Authority be handicapped-accessible. Citing the central message of Davis as a negative one, i.e., Sec. 504 does not impose a duty to engage in affirmative action,[5] the court of appeals overturned the order. It disagreed with the district court's opinion that "there are no qualifications for riding a bus" and concluded instead that because wheelchair users cannot board and ride buses unless the buses are specifically outfitted, in this sense, the mobility-impaired were not qualified to ride ordinary buses.
 
 
 135
 I note, however, that Rhode Island was decided before the Supreme Court's amplification of Davis in Choate declaring that unless a significant alteration is implicated, accommodation must be made.
 
 
 136
 As to the financial burden, a proper consideration under Choate, DOT's own data supports the conclusion that designing and manufacturing new buses which are wheelchair accessible do not effect a substantial change. According to DOT's Final Regulatory Impact Analysis ("RIA"), in 1975, the capital cost of adding a lift to a regular transit coach was placed at $10,000, an increased amount to be sure, yet hardly exorbitant considering the benefit of integration to the handicapped and to our citizenry as a whole. RIA, IV-5; App. at A-197. Eighty percent of this amount is subsidized by federal grants. 49 U.S.C.App. Secs. 1602, 1604.[6]
 
 
 137
 Disabled in Action of Baltimore v. Bridwell, 593 F.Supp. 1241 (D.Md.1984), because of its strong reliance on Rhode Island Handicapped Action Committee, 718 F.2d at 496-97, and APTA v. Lewis, 655 F.2d at 1272, is not persuasive authority.[7]
 
 
 138
 I can perceive no clearer example of non-intentional conduct resulting in uneven treatment to the disabled admonished against in Choate and more recently in Traynor v. Turnage, 485 U.S. 535, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988) (disabled veterans challenged regulatory definition of alcoholism as "willful misconduct"), than that which emanates from the exclusion to mass transit caused by physical barriers. This inability deprives the handicapped of spontaneous activity, whether it be of an emergency, business or a pleasurable nature. Although not a purposeful means of exclusion, it is further testimony of the "benign neglect" syndrome which Congress sought to eliminate.
 
 
 139
 The presumption in favor of strong deference to an agency's interpretation of its regulations, applicable in instances where Congress has been silent or ambiguous as to its intent, may be overcome by a showing of convincing evidence of a contrary legislative intent. Traynor v. Turnage, 485 U.S. at ----, 108 S.Ct. at 1378. Concern for the disabled permeates the legislative history of Sec. 504. The Supreme Court in Choate provides us with a summary of congressional statements dealing with the apathetic attitude towards disabled individuals:
 
 
 140
 Representative Vanik, introducing the predecessor to Sec. 504 in the House, described the treatment of the handicapped as one of the country's "shameful oversights," which caused the handicapped to live among society "shunted aside, hidden, and ignored." 117 Cong.Rec. 45974 (1971). Similarly, Senator Humphrey, who introduced a companion measure in the Senate, asserted that "we can no longer tolerate the invisibility of the handicapped in America...." 118 Cong.Rec. 525-526 (1972). And Senator Cranston, the Acting Chairman of the Subcommittee that drafted Sec. 504, described the Act as a response to "previous societal neglect." 119 Cong.Rec. 5880, 5883 (1973). See also 118 Cong.Rec. 526 (1972) (statement of cosponsor Sen. Percy) (describing the legislation leading to the 1973 Act as a national commitment to eliminate the "glaring neglect" of the handicapped)....
 
 
 141
 ... Similarly, Senator Williams, the chairman of the Labor and Public Welfare Committee that reported out Sec. 504, asserted that the handicapped were the victims of "[d]iscrimination in access to public transportation" and "[d]iscrimination because they do not have the simplest forms of special educational and rehabilitation services they need...." 118 Cong.Rec. 3320 (1972). And Senator Humphrey, again in introducing the proposal that later became Sec. 504, listed, among the instances of discrimination that the section would prohibit, the use of "transportation and architectural barriers," the "discriminatory effect of job qualification ... procedures," and the denial of "special educational assistance" for handicapped children.
 
 
 142
 Id. at 295-297, 105 S.Ct. at 717-718 (footnotes omitted).
 
 
 143
 I conclude that if DOT's regulations, promulgated partially under the authority of Sec. 504, permit physical barriers, which are capable of alteration without change to their fundamental purpose and without undue financial burden, to exclude the handicapped, then the handicapped emancipation legislation represents nothing but hollow rhetoric. Public transit authorities are thereby compelled under Sec. 504 to make reasonable accommodations to their programs, i.e., purchase wheelchair-accessible buses, to fulfill the statute's goal of integration. Subpart E of the regulations, to the extent it can be construed to the contrary, violates Sec. 504.
 
 B. Urban Mass Transportation Act
 
 144
 I next take umbrage with the plurality's blanket assertion that the language of Sec. 16(a) of UMTA does not suggest that Congress has mandated mainstreaming. It is somewhat astonishing that the plurality states that UMTA's "broad and general terms", Opinion at 1193, cannot be construed as defining a particular policy when the section itself specifically announces a national declaration that "elderly and handicapped persons have the same right as others to utilize mass transportation facilities and services." 49 U.S.C.App. Sec. 1612(a). The plurality sidesteps this declaration of equal right of utilization and focuses instead on the portion of the statute ordering the Secretary to make "special efforts" in the planning and design of mass transportation facilities and services. Admittedly, the special efforts required are left undefined, but there is no doubt as to what these efforts must accomplish--the equal right of access. I point out also that although the plurality states that these special efforts must ensure effective utilization of services, the statute refers to both facilities and services. Thus, even granting the Secretary discretion to map out the contours of the "special efforts," he has no such discretion regarding the end of equal opportunity to both mass transportation facilities and services which must be assured. Paratransit only simply does not suffice.
 
 
 145
 The most persuasive authority for a finding that newly purchased buses must be accessible under 16(a) of UMTA is the language of the regulations themselves. What must be decided is the issue which the plurality declined to address--does the precise language of Subpart C of the final rule, ordering that new facilities be designed in accordance with the needs of the disabled, necessarily conflict with Subpart E's local option provision. I am satisfied that the language of the entire rule, including Subpart C, is available for review.[8]
 
 
 146
 As DOT recognizes in the language of its regulations, transportation facilities and transportation services require different considerations. Subpart C of the DOT final rule reads as follows:
 
 
 147
 Each facility or part of a facility constructed by, on behalf of, or for the use of a recipient shall be designed, constructed and operated in a manner so that the facility or part of the facility is accessible to and usable by handicapped persons, if the construction was commenced after the effective date of this part; with respect to the vehicles, unless otherwise provided in Subpart D, this requirement is effective for vehicles for which solicitations are issued or which are leased after the effective date of this part.
 
 
 148
 49 C.F.R. Sec. 27.67 (emphasis added). DOT defines "facility" as "all or any portion of buildings, structures, vehicles, equipment, roads, walks, parking lots, or other real or personal property or interest in such property." 49 C.F.R. Sec. 27.5 (emphasis added). "Services" are not defined by the regulations.
 
 
 149
 The parties urge us to address that which the district court left unanswered--do the requirements of new Subpart E regarding accessibility of transportation services forgive compliance with Subpart C's accessibility requirements for transportation facilities? Since the question has been raised and argued, a response is appropriate. See note 8, supra.
 
 
 150
 Our opinion in Disabled in America v. Sykes, 833 F.2d 1113 (3d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1293, 99 L.Ed.2d 503 (1988), far from operating against ADAPT, is favorable to its position.[9] In Sykes, we discussed DOT's rulemaking activity following the court-ordered remand of the 1979 regulations in APTA v. Lewis, 655 F.2d at 1280. In response to APTA, DOT published its 1981 interim rule, which, while not imposing any specific requirements regarding mass transportation, established a system whereby recipients of UMTA funds could engage in special efforts to satisfy their obligations for promoting transportation services to handicapped individuals.
 
 
 151
 In Sykes, DOT, assuming an amicus role, advanced as a portion of its interpretation of its 1981 regulations that Subpart C, relating to facilities, and Subpart D, relating to services, established separate independent criteria. Further, DOT stated that services and facilities are independent factors and must be evaluated as such and that in order to comply with the regulations and Sec. 504 of the Rehabilitation Act, the requirements set forth in both subparts must be satisfied. Consistent with its position in this matter, DOT argued that the 1981 regulations did not require, as had the pre-APTA Subpart E, that mass transportation services be made fully accessible, i.e., no retrofitting requirements. What was mandated was that the recipients of federal funds certify that special efforts to provide transportation were being made.
 
 
 152
 In Sykes, however, we noted that DOT's intention was clear--compliance with 49 C.F.R. Sec. 27.77 (Subpart D) regarding accessibility of transportation services, does not release federal recipients from compliance with Subpart C's requirements regarding the accessibility of transportation facilities. To clarify this point and explain Subpart D, DOT stated in the preamble to the 1981 regulations:
 
 
 153
 [C]ompliance with the certification under this subsection shall be deemed compliance with section 504, section 16, and section 165. Compliance in this context refers only to compliance with the obligation of the recipients to ensure the provision of transportation service that handicapped persons can use [and planning for such transportation]. The certificate does not stand for compliance with other requirements....
 
 
 154
 46 Fed.Reg. 37,490 (1981). Here, in support of its contention that compliance with Subpart E excuses compliance with Subpart C, DOT makes vague reference to its interpretation that under Sec. 317(c) of the STAA equal services are not required and, therefore, the acquisition of accessible buses is not mandated.
 
 
 155
 Notably absent and distinct from the regulations under scrutiny in Sykes is an express provision that the new regulations take precedence over other requirements. See 49 C.F.R. Sec. 27.61 (1981). DOT labels this a technical oversight--I find it much more significant. There is no interplay mentioned because Subpart E addresses requirements separate from Subpart C's mandate that all newly purchase buses be accessible. Any excuse from compliance would be in opposition to congressional intent.
 
 
 156
 As in Sykes, I would determine that compliance with the special efforts requirements of the Subpart E local option does not constitute a defense to noncompliance with Subpart C's requirement to purchase accessible buses.[10] There is nothing equivocal about Subpart C's language that new facilities be accessible to the disabled. Subpart C no longer contains the retrofitting requirement which the court in APTA found exceeded the statutory mandate and instead confines its accessibility requirement to new purchases. The minimum service criteria of Subpart E can stand only if read as outlining additional requirements to the "accessible purchase" mandate of Subpart C. By my reading, Subpart E's discussion of services, although specifically addressed to buses, does not assume the direction of Section C within its outline of minimum services.
 
 
 157
 At first glance it appears that Subparts C and E need not stand in conflict. Clearly, the option for providing accessible bus service in Subpart E is compatible to the new purchase requirement of Subpart C. Also, the mixed system contemplates compliance with Subpart C. What causes Subpart E to clash with Subpart C is the option allowing paratransit as the sole means of transportation available to the disabled. Opting for such a system plainly abrogates the new purchase directive of Subpart C.
 
 
 158
 Electing paratransit as the means for providing transportation to the disabled also violates the mandate of Sec. 16(a) of the UMTA guaranteeing equal rights to services and its intent to eliminate segregation of the mobility-disabled. This statutory encroachment is manifested in the 24-hour reservation restriction allowed by the minimum service criteria for the paratransit option. This time constraint eradicates the right to spontaneous utilization of mass transit services enjoyed by the non-mobility disabled.
 
 
 159
 I note also that only the "severely disabled" (persons with physical disabilities making them unable to use regular mass transit services) are eligible for paratransit service. In regard to the "transportation handicapped" (persons whose disabilities in any way makes use of transit difficult but not impossible), DOT determined that extension of paratransit eligibility to these persons would be cost prohibitive. DOT emphasized instead that training programs be initiated to assist the transportation handicapped to utilize the mass transit services; however, DOT's statement in this regard appears to be confined to those suffering from mental disabilities which impair the capacity to ride a bus. For those who experience difficulty in utilizing mass transit due to a mobility impairment, no provision has been made for their transportation needs. 51 Fed.Reg. 19,006 (1986). This deprivation affirms that the accessibility of new facilities must be of paramount concern, since, without purchase of such facilities, an entire segment of the disabled population would be excluded from utilizing mass transit.
 
 C. Federal-Aid Highway Act
 
 160
 I am not in general disagreement with the plurality's discussion of FAHA, except to the extent that it appears to construe the Act as mandating retrofitting. ADAPT has carefully informed us that retrofitting is not requested since the enormous financial burden imposed by such a requirement was the reason the 1979 regulations were invalidated under APTA.
 
 
 161
 The confusion concerning the retrofitting requirement, which the plurality indeed acknowledges is not contemplated by Sec. 105(b), is traceable to the plurality's equation of mainstreaming with immediate mainstreaming. Opinion at 1195, n. 9. This is evident by the plurality's conclusion that "[s]ection 165 thus does not speak to the issue of mainstreaming, but only to new purchases." Opinion at 1195. Surely the terms "mainstreaming" and "new purchases" are not exclusive--one subsumes the other. The mainstreaming which is requested here can be accomplished by requiring that when local transit authorities purchase new buses, those vehicles must be accessible.
 
 
 162
 The plurality is, however, persuaded by DOT's argument that Sec. 105(b) of FAHA does not mandate mainstreaming. The rationale embracing DOT's interpretation is most unusual. First, the plurality notes DOT's acknowledgement that FAHA expresses the clear intention of requiring increased accessibility. The plurality then advances an interpretation of the Senate Report accompanying the bill which concludes that although FAHA mandates that programs receiving federal assistance must, to the maximum extent feasible, implement UMTA's mandate that the elderly and handicapped have the same right to utilize mass transportation systems, FAHA is silent as to what is required of existing systems. Concern for the status of existing systems, which speaks to a retrofitting requirement--a measure beyond the requested relief--is clearly inappropriate.
 
 
 163
 The plurality next astonishingly acknowledges that, under FAHA, funds for the purchase of new facilities, specifically new buses, must be spent on facilities which make the buses accessible! In support, the plurality references Congressman Biaggi's pointed remarks which concluded with the proclamation that:
 
 
 164
 My amendment today, will put a stop to future expenditures by the Department of Transportation for equipment and facilities that are inaccessible to the elderly and handicapped. We cannot continue to abide by the doctrine of separate and unequal facilities.
 
 
 165
 120 Cong.Rec. 19,851 (1974). Thus, the only factor which saves the plurality opinion from adopting my conclusion that newly purchased buses must be accessible under FAHA is its contention, which I dispute, that the requirements of Subpart C are not before us.
 
 D. Surface Transportation Assistance Act
 
 166
 I have already reached a conclusion opposite of the plurality concerning the congressional aim of the transportation statutes. My rationale for determining that the goal of integration to the maximum extent feasible need not be repeated. I do, however, find it necessary to point out that Sec. 317(c) of STAA orders only that regulations be promulgated in regard to transportation services and not transportation facilities. We view this as affirmation that Subpart C's mandate that new facilities be accessible, an order which remained unchanged since 1979, means exactly that and cannot be diminished in any respect by the local option provision of Subpart E.
 
 
 167
 The plurality argues that the legislative history of Sec. 317(c) embodies a strong preference for local discretion in the implementation of the transportation services offered to the mobility-impaired. I question the plurality's reliance upon the statements of Senators Exon and McClure made in the context of unenacted legislation, but more importantly, my reading of the regulations promulgated pursuant to Sec. 317(c) does not foreclose the offering of paratransit services and the local authorities' discretion in implementing this type of service. Rather, paratransit as the sole means of transportation available to the mobility impaired is not an acceptable option under the statutes.
 
 III.
 Conclusion
 
 168
 I caution those readers who may view this dissent as an expression of compassion for the mobility-impaired that it must instead be understood that congressionally-mandated equality of opportunity to utilize mass transit, not sympathy, is the basis of its rationale.
 
 
 169
 Our task today is not to sort through empirical data to determine how DOT is to accomplish accessibility. In this regard, reliance on statistics concerning past frequency of utilization of paratransit v. wheelchair accessible buses to justify the paratransit-only option is tantamount to rewarding past failure to accommodate the handicapped.
 
 
 170
 Accessibility to mass transportation facilities and services is the goal which Congress has addressed and has decided must be implemented. I acknowledge DOT's expertise to implement the goal of the statute through its regulatory process and I am not, by a finding of requiring accessibility, cavalier on the issue of cost consideration. What I would instruct DOT to do on remand from the district court is to find a reasonable way in which a mixed system, involving the purchase of new buses which are accessible to the handicapped and paratransit with minimum service criteria consistent with the statutory duty of equal access, be implemented so as to obviate an onerous financial burden on local transit authorities.
 
 
 171
 GREENBERG, Circuit Judge, concurring and dissenting.
 
 
 172
 This appeal and cross appeal present three questions. The first question is whether Congress has mandated mainline bus accessibility, which I would answer in the negative, as does the plurality. The second question is whether the legislation prohibits the Secretary of Transportation from establishing a safe harbor provision which is expressed in terms of a percentage of applicable spending. As the plurality, I would conclude that the Secretary has the discretion to promulgate regulations with such a safe harbor provision.[1] Thus I join in Parts I and II and all of Part III of the plurality opinion except for Parts III(A)(3) and III(A)(5). I write separately on the issues raised in these portions of the plurality opinion.
 
 
 173
 The third and final question is whether the particular percentage figure that the Secretary adopted for the safe harbor provision is arbitrary and capricious. On this point, I must dissent, inasmuch as I conclude that the three percent figure is not arbitrary and capricious, but has substantial support in the rulemaking record.
 
 
 174
 I. THE FEDERAL-AID HIGHWAY ACT AND SUBPART C OF THE REGULATIONS
 
 
 175
 The plurality states that the Federal-Aid Highway Act "arguably requires that ... new buses and rolling stock be accessible." Opinion at 1195. Given the plurality's conclusion that "neither in the express language or the legislative history of these statutes has Congress expressly mandated mainstreaming or indicated an intention to do so," Opinion at 1198, I cannot understand this characterization of the Federal-Aid Highway Act.
 
 
 176
 Surely, the plurality cannot be suggesting that while retrofitting to accomplish mainstreaming is not required, the prospective purchase of only accessible buses is mandated to produce mainstreaming. First, American Public Transit Ass'n (APTA) v. Lewis, 655 F.2d 1272, 1278 (D.C.Cir.1981), in deciding that retrofitting was not required, at most, left the prospective purchase issue open until today. Second, in light of APTA, the complaints which initiated these actions sought only to require that newly purchased buses be accessible--no one has argued in this case that retrofitting is required. Consequently, by suggesting that Congress has required that only accessible buses be newly purchased, the plurality seems to take the position that under the current law, eventually mainstreaming will be mandated. That is, as nonaccessible buses are replaced by new buses which Congress has mandated be accessible, all transit operators will eventually have completely accessible fleets. When the fleets thus become accessible, mainstreaming will have been fully accomplished. In light of this result, the plurality cannot succeed in presenting accessibility and mainstreaming as separate issues.
 
 
 177
 In short, I believe that the plurality misunderstands the import of section 165(b) of the Federal-Aid Highway Act. Section 165 must be read as a whole. Section 165(a) expressly sets standards for buses stating: "The Secretary of Transportation shall require that buses acquired with Federal financial assistance under [specified legislation] meet the standards prescribed by the Administrator of the Environmental Protection Agency under section 202 of the Clean Air Act, and under section 6 of the Noise Control Act of 1972...." 28 U.S.C. Sec. 142 note (1982) (citations omitted) (emphasis added). This subsection does not address the accessibility issue at all. Section 165(b), in contrast, expressly sets standards for projects, facilities, and services rather than buses stating:
 
 
 178
 The Secretary of Transportation shall require that projects receiving Federal financial assistance under [specified legislation] shall be planned, designed, constructed, and operated to allow effective utilization by elderly or handicapped persons who ... are unable without special facilities or special planning or design to utilize such facilities and services effectively. The Secretary shall not approve any program or project to which this section applies which does not comply with the provisions of this subsection requiring access to public mass transportation facilities, equipment, and services for elderly or handicapped persons.
 
 
 179
 Id. (citations omitted) (emphasis added).
 
 
 180
 It is clear that the only portion of this legislation that speaks to the issue of accessibility addresses that issue from the perspective of programs and projects rather than individual buses. Consequently, a program or project that provided for paratransit service would comply with this requirement. The Federal-Aid Highway Act does not provide any support for the contention that Congress has mandated that newly purchased buses must be accessible.
 
 
 181
 The plurality observes that 23 U.S.C. Sec. 142(a)(2) includes the purchase of new buses within the definition of a project. "[T]he Secretary may ... approve as a project on the Federal-aid urban system ... the purchase of buses." 23 U.S.C. Sec. 142(a)(2). This does not state that each and every bus so purchased must be accessible in the fashion that section 165(a) requires that all the buses comply with environmental standards. Instead, only "effective utilization," see section 165(b), by mobility impaired individuals, from the perspective of the whole project or program is mandated. I cannot conclude that this prohibits the purchase of a package comprising both nonaccessible buses and fully accessible paratransit vans.
 
 
 182
 Section 165(b) of the Federal-Aid Highway Act was last amended on January 4, 1975. See Pub.L. No. 93-643, Sec. 105(b), 88 Stat. 2281, 2283 (1975). Consequently, this legislation was in its current form during the many revisions of these regulations and the surrounding litigation. I find it unusual that until today no court expressed the opinion that section 165(b) required the purchase of only accessible buses. At most, several courts have suggested that section 165(b) could arguably serve as the basis for DOT regulations requiring such purchases.
 
 
 183
 Moreover, as the plurality's opinion indicates, Congress has enacted subsequent legislation the text and debate of which assumes that the Federal-Aid Highway Act does not mandate that all newly purchased buses be accessible. The argument that the Federal-Aid Highway Act required the purchase of only accessible buses ignores the subsequent enactment of the Surface Transportation Assistance Act of 1982, Pub.L. No. 97-424, Sec. 317, 96 Stat. 2097, 2153-54, and the legislative debate accompanying that enactment that the plurality summarizes in Part III(A)(4) of its opinion.
 
 
 184
 In Part III(A)(4) the plurality quotes co-sponsor Senator Cranston as stating, in 1982, that "I recognize that is not now feasible to gain approval of legislation that would provide a full guarantee of eventual accessibility." Opinion at 1195 (quoting 128 Cong. Rec. at 30,824). The eventual accessibility that Senator Cranston was discussing was the mainline accessibility as transit operators replaced their fleet of inaccessible buses with new, accessible buses; he was not discussing a phase-in including retrofitting. Implicitly, he was acknowledging that under his view of the prior statutes, Congress had not already mandated that new buses need be accessible. Senator Cranston was not alone; no court has held that Congress has required that all newly purchased buses must be accessible.
 
 
 185
 Not only were congressmen unaware that the Federal-Aid Highway Act had the effect attributed to it today, interested litigants and the courts have missed the point. Accepting the plurality's interpretation of section 165(b) implicitly requires that the court take the position that the plaintiffs in Rhode Island Handicapped Action Committee v. Rhode Island Public Transit Auth., 718 F.2d 490 (1st Cir.1983), and Vanko v. Finley, 440 F.Supp. 656 (N.D. Ohio 1977), failed in their actions to obtain a declaration that federal law mandated that only accessible buses be purchased because they some how overlooked the Federal-Aid Highway Act.
 
 
 186
 No court has held that Congress has required that all newly purchased buses must be accessible. The plurality's dicta comes too close to making such a controversial announcement for me to join its opinion. Ultimately, however, the plurality agrees that the Federal-Aid Highway Act does not mandate mainline accessibility, in that, it does not prohibit transit operators from satisfying their obligation to provide service to mobility impaired individuals solely through paratransit.[2]
 
 
 187
 Having determined that neither federal legislation nor Subpart E of the regulations requires mainstreaming, the plurality nonetheless raises the issue of whether Subpart C of the regulations mandates that all newly purchased buses be accessible. See Opinion at 1195 n. 8, 1196-98. The plurality expressly recognizes that any statement with regard to the effect of Subpart C is dictum. See Opinion at 1196-97. I cannot join in the view expressed in the plurality's dictum that Subpart C of the regulations may require that all newly purchased buses be accessible since the dictum may be understood to undercut the decision that the statutes and regulations do not mandate mainstreaming. Inasmuch as the court today holds that local transit operators who receive federal funds need not provide service to mobility impaired individuals by operating accessible buses, the dictum that the "acquisition of buses without lifts may be in violation of the transportation acts and Subpart C," Opinion at 1197, undermines that decision. It is no answer to say that although newly purchased buses must be accessible, the transit operator need not purchase any new buses, see id. at 1197, since this ignores the fact that buses have a limited lifespan and that as they are replaced the transit operator will be forced to purchase only accessible buses.
 
 
 188
 The plurality's dictum would impose Subpart C's requirement that newly purchased buses be accessible to the handicapped without allowing local authorities to use the exception to Subpart C that is contained in Subpart E. This rejects the Secretary's interpretation of the DOT regulations.[3] Giving appropriate deference to the Secretary's interpretation harmonizes my position today with my joining in the opinion of Judge Mansmann in Disabled in Action of Pennsylvania v. Sykes, 833 F.2d 1113 (3d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1293, 99 L.Ed.2d 503 (1988).
 
 
 189
 In Sykes we deferred to the Secretary's interpretation of DOT's own regulations. See id. at 1117-19. Inasmuch as the Secretary stated that compliance with Subpart D of the regulations did not excuse an independent obligation to comply with Subpart C we properly adopted that construction. When Secretary Dole promulgated the new regulations of Subpart E she explained that compliance with Subpart E of the regulations did excuse compliance with Subpart C.[4]
 
 
 190
 Secretary Dole stated: "Even if a recipient chooses to comply [with Subpart E] through bus accessibility, every new bus need not be accessible to wheelchair users. Only those buses needed to meet service criteria must be accessible." 51 Fed.Reg. 18,998 (1986); see also id. at 19,004. This quote expressly asserts that all newly purchased buses need not be accessible. Only a sufficient quantity of newly purchased buses need be accessible so as to provide the transit authority with a fleet capable of meeting the applicable service criteria. Thus, even if the transit authority elected to provide accessible bus service it would not be prohibited from purchasing some inaccessible buses provided that it purchased enough accessible buses to meet the service criteria. Consequently, to the extent that Subpart C would require that all newly purchased buses be accessible it is clear that the Secretary's position, at the time of the introduction of Subpart E, does not apply this requirement independent of, and in addition to, Subpart E.
 
 
 191
 Secretary Dole's successor has brought that interpretation to the attention of this court. See Brief for James Burnley, Secretary of the United States Department of Transportation at 27-28 & n. 6. As in Sykes I would defer to the Secretary's interpretation of these regulations.
 
 
 192
 Moreover, on my independent analysis of the regulations I would reach the same result. I observe that Subpart E was drafted long after Subpart C. Consequently, I would find that Subpart E was designed to take precedence over the earlier regulations. Subpart D, which was construed in Sykes, was drafted contemporaneously with Subpart C. Also, Subpart E is specifically directed to bus transportation, see 49 C.F.R. Sec. 27.81 (1988), while the more general regulations of Subpart C govern "all programs of the Department of Transportation to which section 504 is applicable," 49 C.F.R. Sec. 27.61 (1988), including transportation by air, rail, and bus. Thus, I would find that the more specific regulations of Subpart E superceded the general provisions of Subpart C. Finally, in this respect I point out that the dedicated and capable attorneys who represented the plaintiffs in this matter surely cannot be held to have failed in their efforts to obtain accessible buses because of a pleading failure.[5]II. THE THREE PERCENT FIGURE IS VALID
 
 
 193
 As the plurality's examination of the relevant statutes demonstrates, Congress delegated broad powers to the Secretary to promulgate regulations detailing substantive standards for handicapped services which would balance the goals of preserving local discretion, avoiding the imposition of unduly burdensome costs, and ensuring adequate transportation services for the handicapped. In its analysis the plurality cites the deferential standard of Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 n. 11, 104 S.Ct. 2778, 2782 n. 11, 81 L.Ed.2d 694 (1984). See Opinion at 1191, 1193, 1198, 1200. Nonetheless, the plurality concludes that the record did not show a rational basis for imposition of the 3% figure. The plurality fails to consider the regulatory scheme as a whole and, as demonstrated herein, the rulemaking record fully supports the Department of Transportation (DOT) regulations and the Secretary's interpretation of those regulations.
 
 
 194
 A. The Regulations Must Be Considered As A Whole
 
 
 195
 The plurality seems to consider the three percent figure contained in 49 C.F.R. Sec. 27.97 (1988) in isolation from the remainder of Subpart E. As a result the plurality underestimates the minimum expenditures necessary to obtain shelter in the safe harbor.
 
 
 196
 It appears that the plurality underestimates the spending level that is required of a transit operator seeking shelter in the safe harbor by failing to consider the "eligible expenses" that may be counted toward the safe harbor figure. First, the regulations provide that only expenditures "specifically to comply with the requirements of this subpart," 49 C.F.R. Sec. 27.99 (1988), are eligible expenses. Thus the cost of providing paratransit or accessible bus service to certain users would not be an eligible expense.[6] Second, the regulations allow only the "incremental costs", 49 C.F.R. Sec. 27.99(b)(2), (4)-(6) (1988), attributable to compliance as eligible expenses. Thus, the language of the regulations suggests that only the portion of cost attributable to lift equipment and other such features would be a qualifying expenditure when a recipient purchased a new, accessible bus; the total cost of the bus could not be considered. See 49 C.F.R. Sec. 27.99(b)(2) (1988). Third, the regulations define as an eligible expense in the case of the "purchase of vehicles" only that portion which is "annualize[d] over the expected useful life of the item." 49 C.F.R. Sec. 27.99(d) (1988). This language suggests that a recipient that purchases a bus with a ten year lifespan can only count one tenth of the cost toward the three percent figure.[7]
 
 
 197
 An example combining the apparent effect of these three limitations should serve to demonstrate how a recipient that spends only the minimum sum to qualify for the safe harbor would, nonetheless, be spending considerable sums to comply with the substantive standards of the regulations. If a transit authority purchased a $100,000 accessible bus for use on its scheduled routes, and if only $10,000 of the cost was directly attributable to its accessible features, and if the bus had a ten year life span, then the purchase of this $100,000 bus would only count as $1000 for purposes of reaching the minimum level of expenditure required to obtain shelter in the safe harbor in the year of purchase. This example demonstrates how the actual funds spent on accessibility may be more than a hundred-fold increase over the sum apparently considered by the plurality.[8]
 
 
 198
 Had the plurality considered the actual size of the safe harbor provision by delving below the three percent figure and examining the expenses which the regulations allow to be counted toward that figure, I cannot conclude that they would have held the three percent figure invalid. Even had the plurality considered the regulations as a whole thus properly calculating the size of the safe harbor provision, I would dissent nonetheless inasmuch as the rulemaking record directly contradicts the plurality's assertions and requires that we uphold the three percent figure.
 
 
 199
 B. The Rulemaking Record Supports the Three Percent Figure
 
 
 200
 The plurality's conclusion largely ignores the Secretary's efforts to comply with the statutory mandate to balance competing factors. The Secretary's regulations define minimum service criteria, 49 C.F.R. Sec. 27.95 (1988), for service to mobility impaired individuals.[9] The minimum service criteria establish standards requiring broad eligibility, comprehensive availability, and reasonable fares. The 3% safe harbor provision is designed to ensure that these criteria do not impose unreasonable cost burdens in excess of the requirements of section 504 of the Rehabilitation Act of 1973. The Secretary, citing APTA, 655 F.2d 1272 (D.C.Cir.1981) (invalidating the Secretary's 1979 regulations as exceeding the authority granted by Sec. 504 by ordering compliance regardless of cost), explained that, "the failure to include an undue burdens provision ... could lead to judicial invalidation of the regulation or reversal of a particular action taken pursuant to the regulation." 51 Fed.Reg. 18,99 6 (1986). The safe harbor accordingly provides a quantifiable limit on mandated compliance costs, one that, consistent with the requirements of section 504, is a reasonable proportion of a transit program's operating budget.[10]
 
 
 201
 Contrary to the plurality's view, however, the particular safe harbor provision at issue here does not eviscerate the minimum service criteria or sanction inadequate service. The record indicates that cities with a population over one million can meet the substantive standards of Subpart E at a cost lower than the minimum sum necessary to qualify for the safe harbor regardless of whether they employ a program of user subsidies enabling handicapped persons to purchase specialized van or taxi services from private providers, directly provide paratransit services themselves, or choose to mainstream mobility impaired individuals on a fleet of buses in which half the buses[11] are accessible to mobility impaired individuals. See 51 Fed.Reg. 19,012 (1986).
 
 
 202
 The record indicates that cities with a population between 250,000 and 1,000,000 can meet the substantive standards of Subpart E at a cost lower than the minimum sum necessary to qualify for the safe harbor regardless of whether they employ a program of user subsidies enabling handicapped persons to purchase specialized van or taxi services from private providers or choose to mainstream mobility impaired individuals on a fleet of buses in which half the buses are accessible to mobility impaired individuals. See id. Only cities of this size that choose to provide directly paratransit services will fail to meet at least one of the substantive standards if they rely on the safe harbor provision. See id.
 
 
 203
 Thus the plurality is incorrect in stating that "cities of less than one million people in which the transit authorities implemented a paratransit-only system would virtually never meet all the applicable service criteria." Opinion at 1201 (citing 51 Fed.Reg. 19,012). Private companies may operate a paratransit service and a transit operator may choose to comply with Subpart E exclusively by subsidizing the cost to mobility impaired individuals of using this private paratransit.
 
 
 204
 The plurality quotes the rulemaking record out of context. What the Secretary found was that in areas with a population greater than 250,000 a paratransit-only system could be operated which would meet all the applicable service criteria at less cost than the minimum sum sufficient to fall within the safe harbor when the system was privately run. The Secretary referred to these private paratransit services as "user side subsidies" inasmuch as the transit operator sought to comply with Subpart E by providing these subsidies rather than operating a paratransit service itself. Thus, at least within the cited portion of the rulemaking record, the term "paratransit" is used to describe only recipient operated paratransit.
 
 
 205
 While it is true that the rulemaking record indicates that such recipient operated paratransit cannot be operated in areas with a population less than one million at less cost than the minimum sum required for shelter in the safe harbor, this cannot serve as the basis for the plurality's conclusion that "[t]he Secretary's claim that the 3% safe harbor provision adequately ensures minimum compliance with the transportation statutes therefore runs counter to the evidence before the agency at least with respect to cities of populations below 1,000,000." Opinion at 1201. As quoted here, the plurality's conclusion fails to consider that these same cities could meet all the service criteria by opting for alternative means, such as privately-operated and user subsidized paratransit or mainline bus accessibility, of providing service to mobility impaired individuals.
 
 
 206
 The record further indicates that cities with a population less than 250,000 can meet the substantive standards of Subpart E at a cost lower than the minimum sum necessary to qualify for the safe harbor if they choose to mainstream mobility impaired individuals on a fleet of buses in which half the buses are accessible to mobility impaired individuals. See 51 Fed. Reg. 19,012 (1986). Only cities of this size that choose to provide recipient operated paratransit services or which employ a program of user subsidies enabling handicapped persons to purchase specialized van or taxi services from private providers will fail to meet at least one of the substantive standards if they rely on the safe harbor provision. See id.
 
 
 207
 The record thus indicates that cities of all sizes that use the means of providing service to mobility impaired individuals which is most cost effective for cities of its size can fully satisfy all of the service criteria at less cost than the minimum expenditure that would qualify the transit authority for the safe harbor provision. For these communities, the 3% safe harbor provision supplies a predictable limit on compliance cost exposure, but does not entail any reduction in the level of service.
 
 
 208
 The safe harbor provision only affects communities that elect to rely on inefficient means of providing service. For example, the record indicates that the least efficient means in communities of all sizes is to provide specialized services directly through a government operated paratransit program.[12] The record shows that cities with over one million residents could provide recipient operated paratransit service meeting the minimum service criteria without spending more than 3% of their operating budgets. See 51 Fed.Reg. 19,012 (1986). The rulemaking record also shows that the cost of full compliance by recipient operated paratransit service in cities of between 500,000 and one million residents would exceed the safe harbor provision by only $9,000 per year. See Brief of James Burnley, Secretary of Transportation at 43-44 (interpreting the figures and tables at 51 Fed.Reg. 19,012 (1986)).
 
 
 209
 The 3% safe harbor provision will admittedly result in less than full compliance in smaller communities[13] electing to provide special services directly. That is, in cities with populations less than 500,000 the least efficient means of providing accessible transit which meets all the service criteria cannot be provided for less cost than the safe harbor sum. But the failure to meet one or more of the minimum service criteria in these communities does not mean that handicapped individuals in those communities receive inadequate service. For example, if the only noncompliance was that the response time for paratransit requests rose from twenty-four to twenty-five hours, see 49 C.F.R. Sec. 27.95(b)(2) (1988), I could not conclude that the service provided to the community was therefore entirely inadequate.
 
 
 210
 Moreover, while the regulations do permit less than full compliance for this class of special service programs, they also set forth two safeguards that ensure adequate service. First, the Secretary has the power to disapprove a proposed program of special services or to condition approval on adoption of specified modifications. See 49 C.F.R. Sec. 27.85(c) (1988). Paratransit operators must accordingly submit a program plan for the Secretary's review and document the rationale for any reduction in service below complete compliance with the minimum service criteria. See id. This approval process effectively requires a paratransit program to adopt only such reductions in service as are reasonable and necessary. See 51 Fed.Reg. 19,029 (1986).
 
 
 211
 No reduction in one service standard, eligibility, may be approved in any circumstances. See 49 C.F.R. Sec. 27.97(b) (1988). Moreover, such reductions as are permitted must still tailor the program to the applicable service standard. While the Secretary is prepared to approve plans that do not fully comply with the minimum service criteria, the illustrations contained in the regulations demonstrate that the Secretary will enforce standards requiring adequate and efficient transportation services. See, e.g., 51 Fed.Reg. 19,02 7 (1986).
 
 
 212
 Second, a program plan contemplating such reductions in service quality must be developed through a public participation process that includes consultation with handicapped persons on such matters as deficiencies in planned service and the transportation needs of handicapped persons. See 49 C.F.R. Sec. 27.83 (1988). The local transit operator is accordingly obligated to make plans and cost estimates available to the public, to respond to significant public comments, and to explain the reasons for not adopting significant suggestions. See id.; 49 C.F.R. Sec. 27.97(c) (1988).
 
 
 213
 This public participation requirement, though procedural in character, is expressly required by the Surface Transportation Assistance Act of 1982, Pub.L. No. 97-424, Sec. 317, 96 Stat. 2097, 2153-54, and calculated to improve the substantive quality of each handicapped services program. The Supreme Court, in addressing standards governing educational programs for the handicapped, has made it clear that such procedural safeguards can have important substantive effects:
 
 
 214
 the congressional emphasis upon full participation of concerned parties throughout the development of the [educational plan], as well as the requirements that state and local plans be submitted to the Secretary for approval, demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content....
 
 
 215
 Board of Education v. Rowley, 458 U.S. 176, 206, 102 S.Ct. 3034, 3050, 73 L.Ed.2d 690 (1982).
 
 
 216
 In my view, the plurality's conclusion that the 3% figure is arbitrary does not adequately take into account the rulemaking record. The 3% safe harbor provision, operating in conjunction with a set of substantive standards, the Secretary's approval process, and the public participation process, ensures that each locality's program will provide acceptable service meeting federally legislated requirements without incurring unduly burdensome compliance costs.
 
 
 217
 In short, the 3% figure was justified on the rulemaking record as designed to reflect the cost of providing the level of service embodied in the substantive standards. Rather than subject every transit authority to continuous administrative supervision for compliance with these standards, however, the expenditure level was specified as a safe harbor provision. Not only is this neither arbitrary nor capricious, it fosters the congressionally authorized goal of maintaining local discretion.
 
 
 218
 C. The Facial Challenge to Subpart E Must Fail
 
 
 219
 I respectfully state that the most fundamental error of the plurality's analysis is revealed in its summary and rejection of the reasons I have advanced in support of the safe harbor. The plurality recognizes that these appeals only present a facial challenge to Subpart E of the regulations, see Opinion at 1202-1203, yet the plurality proceeds to invalidate the safe harbor provision because it may be applied, in some instances, so as to allow service which may fall below the level required by the applicable legislation. It is obvious that the plurality concedes that the Secretary could apply the regulations in a manner so as to approve only those plans that fulfill the congressional mandate, yet the plurality is unwilling to assume that the Secretary will so limit his discretion.[14]
 
 
 220
 Today, however, the court is presented with a challenge to Subpart E of the regulations on their face. If the Secretary in fact abuses his discretion by approving plans that allow service at a level below that mandated by Congress, then at that time a challenge could be brought to Subpart E as it is applied. At this time, however, we must assume that the Secretary will use his discretion to apply Subpart E in a manner consistent with the governing statutes.
 
 
 221
 This court has previously relied on this distinction between facial challenges and challenges to application of regulations in cases where the plaintiff asserts that a federal regulation is facially inconsistent with federal legislation. Thus, in a case challenging regulations of the Nuclear Regulatory Commission, Chief Judge Gibbons wrote:
 
 
 222
 [W]e find no facial inconsistency between the present version of 10 CFR Sec. 2.790 and Sec. 103(b)(3) of the Atomic Energy Act. Applications of the rule in specific instances might violate the policy of Sec. 103(b)(3), but there is no need to anticipate such violations, and ample opportunity for judicial intervention to prevent them.
 
 
 223
 Westinghouse Elec. Corp. v. United States Nuclear Regulatory Comm'n, 555 F.2d 82, 92 (3d Cir.1977); see also Bowen v. Yuckert, 482 U.S. 137, 145 & n. 4, 152 n. 9, 154 & n. 12, 107 S.Ct. 2287, 2293 & n. 4, 2296 n. 9, 2297 & n. 12, 96 L.Ed.2d 119 (1987); Quivira Mining Co. v. United States Nuclear Regulatory Comm'n, 866 F.2d 1246, 1259-60 (10th Cir.1989).
 
 
 224
 Accordingly, in this facial attack on Subpart E, the burden is upon the plaintiffs to show that these regulations cannot be applied consistently with applicable federal legislation. This simply has not been demonstrated.
 
 
 225
 The plurality relies on Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), for the proposition that a different standard of review is applicable,[15] see Opinion 1200-01; but that case is distinguishable in that it presents a completely different type of regulation. At issue there was the rescission of a regulation that had required that motor vehicle manufacturers include passive restraints in new motor vehicles. Under the rescission no governmental body had discretion to impose or except the inclusion of such safety devices--the rescission, on its face, exempted all manufacturers from the need to include passive restraints. Consequently, there was no need and indeed no opportunity for parties interested in preserving the prior regulation that had mandated that manufacturers include such restraints to wait to make an "as applied" challenge. Quite simply, the rescission was self-executing.
 
 
 226
 In contrast, Subpart E of the regulations empowers the Secretary of DOT with discretion which he must exercise in reviewing each recipient's plans to provide service to mobility impaired individuals. While in a particular case the Secretary may abuse that discretion, if he does a party with standing will be able to obtain relief but the regulation will stand.
 
 
 227
 The plurality erroneously concludes that this distinction is not applicable because the safe harbor provision "admits of no uncertainty in application." Opinion at 1202. The issue is not whether DOT will excuse transit operators from spending in excess of the safe harbor sum, rather the issue is what quality of service a transit operator relying on the safe harbor will actually provide. Even in smaller communities where transit operators rely on inefficient means of providing service to mobility impaired individuals and which seek to limit their expenditure to the minimum sum necessary to find shelter within the safe harbor, the transit operators must submit their proposed programs to the Secretary for his approval and they must develop that program through a public participation process. See supra Diss. Op. (Greenberg) at 1224-1225. Consequently, it is entirely possible that the level of service provided by such a transit authority would comply with legislative mandate even though the transit operator relied on the safe harbor rather than fulfill the service criteria of the regulations. Thus, like Westinghouse Electric Corp., the regulation at issue may be applied in a fashion consistent with the underlying legislation. That is, on the record before the court, it is premature to say that a single application of the safe harbor provision would allow a transit operator to deny mobility impaired individuals the level of service that Congress has required.[16]
 
 
 228
 The plurality's reliance on EPA v. National Crushed Stone Ass'n, 449 U.S. 64, 72 n. 12, 101 S.Ct. 295, 301 n. 12, 66 L.Ed.2d 268 (1980), is misplaced. As I understand that case, to the extent that its holding is at all germane here, it is because the court held that the economic capability of the regulated entities could not be considered as a factor in a determination to allow a variance from the applicable standards. Clearly, the parallel holding here would be that no safe harbor could be valid, as the Court in that case was not relating its holding to a particular entity but rather was upholding the elimination of a criterion which could be considered by the agency in taking action. Here, however, no judge is contending that the concept of the safe harbor is invalid. It is only the particular level which is questioned. That simply cannot be done on a facial challenge, at least on the record here which shows that communities of all sizes can meet all of the service criteria at less cost than the safe harbor limit. Therefore, under well-established principles the 3% safe harbor must be upheld.III. CONCLUSION
 
 
 229
 For the foregoing reasons, I join in Parts I and II and all of Part III of the plurality's opinion except for Parts III(A)(3) and III(A)(5), while I separately concur with the ultimate conclusion of Part III(A)(3), and I dissent from Part IV. Circuit Judges STAPLETON and HUTCHINSON join in all of this opinion and Circuit Judge SEITZ joins in Part I of this opinion.
 
 
 
 [1]
 By "paratransit," we describe those transportation services, usually performed by wheelchair-accessible vans, that are provided to the handicapped separate from the mass transit's normal operations. DOT refers to paratransit in its regulations as "special service systems." See 49 C.F.R. Sec. 27.95(b) (1987). In general, paratransit is transportation that is provided upon request by the handicapped individual
 
 
 [2]
 An action similar to ADAPT's, filed by the Eastern Paralyzed Veterans Association ("EPVA"), was consolidated with ADAPT's and is before us as well. EPVA's complaint challenged the imposition of the safe harbor provision to excuse noncompliance with the minimum service criteria, alleging that the 3% figure was selected in an arbitrary and capricious manner. On appeal, No. 88-1178, EPVA contends that the district court, after voiding the 3% provision, erred in remanding to DOT the regulations outlining the minimum service criteria. EPVA maintains that in the event the remand was appropriate, the district court should have set a timetable for promulgation of the final regulations. We address these issues infra
 
 
 [3]
 In presenting the bill, Senator Humphrey announced that "[t]he time has come when we can no longer tolerate the invisibility of the handicapped in America." 118 Cong.Rec. 525 (1972)
 
 
 [4]
 The Act directs the Secretary to publish and promulgate regulations
 not later than ninety days after January 6, 1983 ... establishing (1) minimum criteria for the provision of transportation services to handicapped and elderly individuals by recipients of Federal financial assistance ... and (2) procedures for the Secretary to monitor recipients' compliance with such criteria.
 49 U.S.C.A.App. Sec. 1612(d).
 
 
 [5]
 The district court also found arbitrary and capricious the Secretary's decision to permit local transit operators to include within the amount of money encompassed by the 3% limitation the costs incurred in offering half-fare discounts to the elderly and the handicapped during off-peak hours. See 676 F.Supp. at 642-43. In contrast, the court found reasonable the regulations that the transit operator be required to meet the minimum service criteria and thus provide transportation services to the handicapped at full performance level as soon as reasonably feasible but in any case within six years of the initial determination of DOT's approval of its program. 49 C.F.R. Sec. 27.95(a). See 676 F.Supp. at 643. The government has not appealed that aspect of the district court's decision striking down the inclusion of the half-fare program within the safe harbor funds and neither ADAPT nor EPVA challenges the reasonableness of the six-year phase-in
 
 
 [6]
 Summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. On review the appellate court is required to apply the same test the district court should have used initially. Goodman v. Mead Johnson and Co., 534 F.2d 566, 573 (3d Cir.1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). In determining the applicable law, we must examine the district court's interpretation of the DOT regulations. This is a question of law subject to plenary review. Disabled in Action of Pennsylvania v. Sykes, 833 F.2d 1113, 1116 (3d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1293, 99 L.Ed.2d 503 (1988)
 
 
 [7]
 With respect to Sec. 16(a) of UMTA, its sponsor, Rep. Biaggi, stated that the amendment was intended to "grant[ ] equal rights [to the disabled and elderly] to use public facilities with the same ease as everyone else." 116 Cong.Rec. 34,180, 34,181 (1970). He also apparently rejected paratransit-only programs when he stated that "they would further serve to segregate the elderly and the handicapped from our society." Id. Taken alone, these statements might lead us to conclude that mainstreaming was mandated. However, the language of UMTA, which only requires "special efforts," see infra at 1193-94, militates against this view
 
 
 [8]
 In fact, Subpart C of DOT's regulations, which is not before us, see infra at 1196-98, on its face apparently requires that all newly built facilities and newly purchased buses be accessible. See 49 C.F.R. 27.67(a) (1987)
 
 
 [9]
 This conclusion is consistent with Rep. Biaggi's comments on Sec. 105, the amendment to Sec. 165. Rep. Biaggi, in commenting on Sec. 105, stated that Sec. 16(a) of UMTA "sought to require [that] the design and construction of all new mass transit systems, equipment, and facilities be totally accessible to the elderly and the handicapped." 120 Cong.Rec. 19,851 (1974). This statement does not suggest that Sec. 165 mandates retrofitting, which would be the central requirement if immediate mainstreaming were required
 
 
 [10]
 We disagree with Judge Greenberg's contention in dissent that when Secretary Dole promulgated Subpart E, she explained that compliance with Subpart E would excuse compliance with Subpart C. See post at 1219 & n. 4. As we read the two citations that he provides, they do not support that contention
 At 51 Fed.Reg. at 19,004, Secretary Dole merely takes the position that it is not mandatory for a city to provide a system of accessible bus service, especially in light of the high costs of retrofitting. The Secretary justifies the decision not to require a system of accessible bus service in part because "[i]n the Department's experience, this approach was not successful. The high cost of making old rail systems accessible was one of the most important factors leading the Court of Appeals in the APTA case to declare that the 1979 rule imposed undue burdens." 51 Fed.Reg. at 19,004. This says nothing about whether, if a municipality is operating an adequate paratransit system, it is excused from any requirement that the new buses that it purchases be accessible.
 At 51 Fed.Reg. at 18,998, Secretary Dole states that " '[e]ven if a recipient chooses to comply [with Subpart E] through bus accessibility, every new bus need not be accessible to wheelchair users. Only those buses needed to meet service criteria must be accessible.' " Post at 1219 (quoting 51 Fed.Reg. at 18,998) (brackets added by dissenting opinion). These sentences, as we read them, merely state that municipalities electing the accessible bus service option of Subpart E need not make every new bus accessible in order to comply with the minimum service criteria of Subpart E. They do not state that compliance with Subpart E excuses a municipality from complying with Subpart C; rather, they state only that Subpart E does not independently require that municipalities purchase only accessible buses. Although these sentences are not wholly unambiguous, we cannot conclude based on these two sentences, buried in a lengthy release, that Secretary Dole "explained that compliance with Subpart E of the regulations did excuse compliance with Subpart C." Post at 1219.
 
 
 [11]
 The conclusion that paratransit services attract greater numbers of handicapped riders is also supported by independent research. As the Secretary noted in the rulemaking record, the RIA figures on comparative ridership are consistent with a survey conducted for the National Cooperative Highway Research Program. See RIA at VI-7
 
 
 [12]
 We use the term "safe harbor" because the 3% figure refers to the minimum level of spending which the Secretary will deem to constitute compliance with the UMTA and section 504. The regulations have previously provided a series of alternative safe harbor provisions. See Rhode Island Handicapped Action Committee v. Rhode Island Public Transit Authority, 718 F.2d 490, 493-94 & nn. 5 & 6 (reviewing the three safe harbor provisions of the 1981 regulations); Disabled in Action of Baltimore v. Bridwell, 593 F.Supp. 1241, 1246-47 (D.Md.1984) (same). Only the 1979 regulations as interpreted in APTA v. Lewis, 655 F.2d 1272, did not provide such safe harbors, and these regulations were invalidated by the D.C. Circuit as exceeding the authority granted by Sec. 504. 655 F.2d at 1280
 Many transit authorities apparently spend in excess of the specified minimum percentage. See, e.g., Rhode Island Handicapped Action Committee, 718 F.2d at 494 n. 7 (finding that the local transit authority spent 46% of the applicable funds for services for the elderly and handicapped when the regulations then in effect established a 3.5 percent safe harbor). Disabled in Action of Baltimore, 593 F.Supp. at 1247 (finding that the local transit authority spent 3.9, 4.4, 5.7, 6.4, and 9.3 percent of the applicable funds from 1979 to 1983, respectively, on its paratransit program in addition to expenditures for taxi subsidies and mainline accessibility when the regulations then in effect established a safe harbor that varied between 2 and 3.5 percent); Vanko v. Finley, 440 F.Supp. 656, 668 (N.D.Ohio 1977) (finding that the local transit authority's spending on services for the mobility-impaired "greatly surpasses" the regulatory safe harbor); 51 Fed.Reg. at 19,013 (four of seven RIA case study cities spend more than proposed safe harbors).
 
 
 [13]
 Arguably, UMTA, STAA, or the Federal-Aid Highway Act could require more than Sec. 504, but we find neither language nor legislative history that would indicate that those acts would mandate or permit the imposition of extraordinary expenditures to satisfy the mandates of those acts
 
 
 [14]
 There is language in the Final Rule that would indicate that the service criteria cannot be undercut by the safe harbor provision. See 51 Fed.Reg. at 19,010 ("The preamble discussion of this proposed section stated that the accessible bus and special service components of the mixed system, taken together, would have to meet all the service criteria."). However, DOT eliminated the force of this statement when it stated that "[t]he full performance level for a mixed system is reached when, subject to the overall limit on required expenditures, each component of that system meets the service criteria...." Id. at 19,011 (emphasis added). Therefore, there can be no question that the 3% safe harbor provision places a limit on the requirements set forth in the minimum service criteria
 
 
 [15]
 Because we hold that this particular safe harbor is arbitrary and capricious, we do not reach the issue whether some other safe harbor provision would be permitted by the STAA
 
 
 [1]
 I am in general agreement with the plurality's recitation of the history of the statutes and regulations but pause to comment upon the context in which it quotes the statement that HEW's guidelines should not be construed " 'to preclude in all circumstances the provision of specialized services as a substitute for, or supplement to, totally accessible services....' 43 Fed.Reg. at 2134." Opinion at 1188. The import of this sentence is understood only in the framework of HEW's entire remark:
 First, section 504, like other nondiscrimination statutes, prohibits not only those practices that are overtly discriminatory but also those that have the effect of discriminating. And it is equal opportunity, not merely equal treatment, that is essential to the elimination of discrimination on the basis of handicap. Thus, in some situations, identical treatment of handicapped and nonhandicapped persons is not only insufficient but is itself discriminatory. On the other hand, separate or different treatment can be permitted only where necessary to ensure equal opportunity and truly effective benefits and services. Federally assisted programs and activities must thus be provided in the most integrated setting appropriate to the needs of participating handicapped persons.
 
 
 [43]
 Fed.Reg. 2134. It is misleading for the plurality to utilize only a selected portion of HEW's rationale to imply that paratransit only could satisfy the integrative mandate of Sec. 504. Instead, HEW's guidelines made it imperative that equal opportunity, an end clearly not satisfied by paratransit alone, be implemented by the various federal agencies' regulations
 
 
 [2]
 I respond here to the plurality's reference that in Disabled in Action in Pennsylvania v. Sykes, 833 F.2d 1113 (3d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1293, 99 L.Ed.2d 503 (1988), we have previously characterized Sec. 504 as ambiguous. My discussion here obviously does not repudiate this belief. Sykes, however, is distinguished to the extent that, here, unlike Sykes, in addition to Sec. 504, we also review the regulations under the precise language of UMTA, FAHA, and STAA wherein the mandate of equal accessibility is obvious
 
 
 [3]
 At oral argument on rehearing of this matter, ADAPT informed the court that the cost of a wheelchair lift on a new bus represents 5-7% of the capital cost of the vehicle. See also note 4, infra and Diss.Op. (Mansmann), at 1208
 
 
 [4]
 To the extent that the language of APTA regarding the onerous financial burden of the 1979 regulations might be construed as attributable to the new bus accessibility requirement, I maintain that this mandate was not the impetus for invalidation of the 1979 regulations. In APTA, the court noted that the additional cost to make a new bus accessible was $12,000.00 to $15,000.00. In regard to this amount, the court did not opine that this represented an extraordinary expense; rather, its comment on the expenditure was couched in its concern that the federal government was under no obligation to continue its 80% subsidization of this cost. APTA v. Lewis, 655 F.2d 1272, 1276 n. 6
 
 
 [5]
 Justice Marshall in Choate commented upon the use of the term "affirmative action" in the Court's Davis decision
 In Davis, we stated that Sec. 504 does not impose an "affirmative-action obligation on all recipients of federal funds." 442 U.S., at 411 [, 99 S.Ct. at 2369-70]. Our use of the term "affirmative action" in this context has been severely criticized for failing to appreciate the difference between affirmative action and reasonable accommodation; the former is said to refer to a remedial policy for the victims of past discrimination, while the latter relates to the elimination of existing obstacles against the handicapped. See Note, Accommodating the Handicapped: The Meaning of Discrimination Under Section 504 of the Rehabilitation Act, 55 N.Y.U.L.Rev. 881, 885-886 (1980); Note, Accommodating the Handicapped: Rehabilitating Section 504 After Southeastern, 80 Colum.L.Rev. 171, 185-186 (1980); see also Dopico v. Goldschmidt, 687 F.2d 644, 652 (CA2 1982) ("Use of the phrase 'affirmative action' in this context is unfortunate, making it difficult to talk about any kind of affirmative efforts without importing the special legal and social connotations of that term."). Regardless of the aptness of our choice of words in Davis, it is clear from the context of Davis that the term "affirmative action" referred to those "changes," "adjustments," or "modifications" to existing programs that would be "substantial," 442 U.S., at 410, 411, n. 10, 413 [99 S.Ct. at 2369, 2370 n. 10, 2370,] or that would constitute "fundamental alteration[s] in the nature of a program ...," id., at 410, [99 S.Ct. at 2369] rather than to those changes that would be reasonable accommodations.
 469 U.S. 287, 300 n. 20, 105 S.Ct. 712, 720 n. 20.
 
 
 [6]
 The fact of federal subsidy does not appear to have been considered by the Supreme Court in its Davis decision. When discussing the possibility that technology may one day lessen the financial burden of implementing equal opportunities to the disabled, the burden imposed upon a State was the focus of the Court's concern. 442 U.S. at 412, 99 S.Ct. at 2370
 
 
 [7]
 I note a more general criticism of reliance on APTA, Rhode Island and Bridwell. While it is accurate that these cases hold that Sec. 504 does not mandate mainstreaming, it is crucial to realize that the decisions discussed only Sec. 504
 In APTA, the matter was remanded to the district court to determine whether UMTA, FAHA or STAA were enforced by the regulations. Likewise, because the district court in Rhode Island did not consider the requirements of the specific transportation statutes, their import was not discussed by the court of appeals.
 In Bridwell, the action was brought under only Sec. 504 and Sec. 16(a) of UMTA and, except for a very limited portion, the UMTA count was dismissed on the defendant's summary judgment motion.
 Thus, while the plurality correctly states that "every federal court that has addressed the question whether mainstreaming in public transit is required has concluded that Sec. 504 does not mandate mainstreaming," Opinion at 1193, the discussions in APTA, Rhode Island and Bridwell are deficient because of their silence on the implications of UMTA, FAHA and STAA.
 
 
 [8]
 I find it imperative to counter specifically the plurality's position that Subpart C, not having been pled nor significantly argued, is not before us. Opinion at 1195, n. 8; 1196-1198
 I begin with ADAPT's amended complaint. The complaint's very first paragraph requests "that the court vacate certain provisions of a final rule...." App. at A-384. This language does not imply that only certain portions of the rule are to be considered; rather, it is the entire rule, of which Subpart C is an integral element, which must be reviewed.
 Second, the plurality notes that neither ADAPT nor EPVA has requested declaratory or injunctive relief with respect to Subpart C. I first observe that there is no reason why such a specific request is necessary. Subpart C, though part of the final rule at issue, was left unchallenged. If Subpart E is declared invalid, as I hold should be done, Subpart C remains intact. No affirmative request by ADAPT or EPVA is required to have Subpart C, which, unlike Subpart E, has remained consistent in its language, continue to operate as it stands.
 Although I conclude that requesting a declaration from the district court that Subpart C's mandate of full accessibility of facilities is left unchanged is superfluous, I am not at all convinced that such relief was not, in fact, prayed for by ADAPT. In its amended complaint, ADAPT asked the court, in part, to:
 Issue a writ of mandamus, a preliminary and permanent injunction, a declaratory judgment, and any other equitable relief necessary to: (a) declare invalid and vacate [Subpart E] of defendant's final rule concerning "Non-discrimination on the Basis of Handicap in Programs Receiving Financial Assistance from the Department of Transportation...."
 App. at A-420.
 Arguably, a declaratory judgment or other equitable relief necessary to declare invalid Subpart E would entail an implicit declaration that Subpart C's provision that all newly purchased buses be accessible remains viable.
 Further supposition as to what ADAPT was requesting is rendered unnecessary, however, by the very clear conclusion in the Reply Memorandum of Plaintiffs' ADAPT, et al., In Support Of Their Motion For Summary Judgment And In Opposition To Defendant's Cross-Motion For Summary Judgment:
 For the foregoing reasons, and for all the reasons stated in our opening memorandum, the Motion of Plaintiffs ADAPT, et al., for summary judgment should be granted and a decree entered which vacates [Subpart E], declares that [Subpart C] independently requires that all new vehicles be accessible to handicapped persons, and vacates [Subpart E]. In the event that the declaratory judgment regarding [Subpart C] is not issued, the decree should remand [Subpart E] to the Secretary with instructions to revise that section, within thirty days, to insure that handicapped persons be provided effective and integrated transportation services by DOT grantees, and, in the interim, retain in effect the service criteria contained in [Subpart E].[38]
 
 
 [38]
 DOT contends that "the only course of action available" to this Court is "to vacate all of the provisions of the 1986 regulation and remand the entire matter to the Secretary for further consideration." DOT Mem. at 150. That, of course, is contrary to Davis v. Romney, 490 F.2d 1360 (3d Cir.1974), and the other authorities cited in our opening memorandum at 122-24. Maintaining the 1986 standard as an interim measure (should the court not accept our argument regarding [Subpart C] would be more equitable than vacating that standard entirely (thus reverting the country back to the completely standardless 1981 rule), especially since there is no contention by anyone in this case that the 1986 rule goes too far. Alternatively, should the Court agree that its only remedy is to vacate, then it should also vacate the 1981 rule (thus reinstating the 1979 requirements, at least on an interim basis), since the 1981 rule suffers from the same deficiencies (but even more egregious) as those of the 1986 rule.
 App. at A-665-66 (emphasis added).
 Although DOT's summary judgment submissions were not included in the joint appendix, it is obvious that it felt the need to respond to ADAPT's argument concerning Subpart C, evidenced by its request, in its memorandum to the district court, that all the provisions of the 1986 rule be vacated and remanded to the Secretary. App. at A-666, n. 38.
 Surely, in tandem, the prayer for relief in the complaint and the conclusion in the summary judgment reply brief sufficed to squarely place the issue of Subpart C before the district court. In this sense I agree with the opinion filed by Judge Greenberg expressing serious doubt that a pleading error, or, as I view it, a minor procedural inexactitude, would preclude the important right pursued by ADAPT and EPVA. Diss.Op. (Greenberg), Opinion at 1218.
 Third, it is simply not true that argument focusing on the import of Subpart C was not significantly advanced before the district court. In the Memorandum of Plaintiffs' ADAPT, et al., In Support Of Their Motion For Summary Judgment, ADAPT argued its applicability in a footnote:
 
 
 [4]
 [Subparts C & D] remain a part of the current DOT rule. However, the effect of the actions of the Secretary in promulgating [Subpart E] of the challenged rule has been to nullify the requirements of those previous sections.
 In Disabled in Action of Pennsylvania v. Sykes, No. 86-2316 (E.D.Pa. Dec. 30, 1986) the court construed the new construction and alteration provisions of [Subpart C], and ruled that so long as the grantee met the cost limitations of the DOT rule, the requirements of [Subpart C] did not have to be met. Sykes did not address the validity of the DOT rule, but merely construed it in such a way that nullified the effect of [Subpart C]. In a brief filed in a different case, EPVA v. SEPTA, No. 85-4460 (E.D.Pa.), the Secretary disagreed with the ruling of the Sykes court, and agreed with plaintiffs' construction:
 The plaintiffs state that the new construction and alteration of subway stations is governed by [Subpart C] which is not subject to the spending limitation specified in the Appendix to the 1981 regulations. While this statement is correct, it has no relevance to the pending Rule 59(e) motion.
 Federal Defendants' Opposition to Plaintiffs' Rule 59(e) Motion to Alter or Amend Judgment (served Dec. 30, 1986), at 2 n. 3 (emphasis added). Especially in light of this stated position of the Secretary, and the ambiguity of the rule, it is critical that the Secretary be ordered to clarify that all new or newly altered facilities must be accessible.
 App. at A-501 (emphasis in original).
 ADAPT also argued in the text of its summary judgment brief that the requirements of Subpart C must be clarified:
 [Subpart C] was never explicitly abrogated by either the 1981 rule or by the challenged rule. Indeed the Secretary recently has asserted in the case of EPVA v. SEPTA that [Subpart C] remains in full force. See supra p. 69 note 49. However, there is sufficient ambiguity in the rule that a DOT grantee, the City of Philadelphia, was recently able to persuade the court in Disabled in Action of Pennsylvania v. Sykes, No. 86-2316 (E.D.Pa. Dec. 30, 1986) that [Subpart C] conflicts with the other provisions of the rule, and therefore, can be viewed as abrogated. Moreover, numerous commenters on the challenged rule specifically requested the Secretary to explicitly clarify this issue, but she refused to do so.
 In view of the position the Secretary has taken in the EPVA v. SEPTA case, in view of the fact of record that insuring accessible new construction or alterations would entail only de minimus burdens for DOT grantees, and in view of the ambiguity of the current rule as evidence by the Disabled in Action v. Sykes decision and by the comments in the rulemaking docket, it would be irrational, arbitrary and capricious for the Secretary to refuse to change the rule to provide unambiguously that all new and newly altered facilities must be accessible.
 App. at A-541-43 (emphasis in original) (footnotes omitted).
 Next, referring again to the Reply Memorandum In Support of ADAPT's Motion for Summary Judgment and in Opposition to DOT's Cross-Motion for Summary Judgment, ADAPT devoted an entire section to the applicability of Subpart C:
 
 
 [1]
 Since the Secretary Now Concedes that the Requirements of Subpart C of the DOT Rule Stand Independently, and Since Subpart C Already Requires that All New Buses Be Accessible, There is No Basis for the Secretary's Failure to Include that Same Requirement In the New Subpart E.9
 App. at A-618. After quoting Subpart C, ADAPT continued:
 On July 15, 1987, subsequent to the filing of our opening memorandum in this action DOT filed an amicus curiae brief in the Court of Appeals in Disabled In Action of Pennsylvania v. Sykes, No. 87-1021 (3d Cir.). A copy of that brief is attached as Appendix A. In point II of its Sykes amicus brief, DOT expressly acknowledges that the requirements of Subpart C, including the requirement that all new bus purchases be for accessible vehicles, sets forth mandates that are independent of the restrictions of the 1986 rule, i.e., the new Subpart E. No other regulatory requirement, in Subpart E or elsewhere, vitiates the mandate of [Subpart C]. As the Secretary now explicitly concedes (amicus brief at 9), "the more general program requirements concerning the accessibility of facilities of all transportation modes, including mass transit, set forth in Subpart C, were not diminished in any way" by any other subpart of the rule.
 Since [Subpart C] of the DOT rule already independently requires that all new vehicles be accessible, including the same requirement as part of [Subpart E] would impose no additional burden on any transit system. Therefore, there is no basis for the provisions of [Subpart E] that permit transit authorities to continue to purchase inaccessible buses.
 App. at A-618-19 (footnotes omitted).
 It is true that in deciding the summary judgment motion, the district court did not address the interplay between Subparts C and E. Nonetheless, a similar silence by the district court on the question of the statutory requirements of FAHA does not cause the plurality such consternation. "Although ADAPT raised the issue below, the district court reached its conclusion that Congress has not ordered mainstreaming of the disabled without commenting on section 105(b) of the Federal-Aid Highway Act. We hold what is implicit in the district court's silence, that the Federal-Aid Highway Act does not speak to whether mainstreaming is required." Opinion at 1194. As a preface to this statement, the plurality remarks that FAHA's applicability was raised below. Thus, should not the same consideration apply to the Subpart C question?
 Fourth, ADAPT's Subpart C position was unquestionably argued in its main brief on appeal to us. In labeling ADAPT's efforts in pressing the Subpart C argument as insignificant, the plurality refers solely to ADAPT's statement that only the validity of Subpart E is challenged by the appeal. The plurality neglects to finish ADAPT's discussion. Immediately following the sentence quoted by the plurality, ADAPT noted the express and independent provisions of Subpart C and quoted the section in full. ADAPT Br. at 27. ADAPT then referenced the argument advanced by DOT, contrary to its position here, in Disabled in America v. Sykes, 833 F.2d 1113 (3d Cir.1987):
 In 1987, DOT filed an amicus curiae brief (A-667) with this Court in DIA v. Sykes, 833 F.2d 1113 (3d Cir.1987). In that brief, DOT expressly acknowledged that the requirements of subpart C, including the requirement that all new bus purchases be for accessible vehicles, set forth independent mandates. No other regulatory requirement, in subpart D or E or elsewhere, vitiates the mandate of [Subpart C]. As DOT informed this Court in Sykes, when former subpart E was deleted in 1981 "the more general program requirements concerning the accessibility of facilities of all transportation modes, including mass transit, set forth in subpart C, were not diminished in any way" (A-683).
 In Sykes, this Court held flatly that the less rigorous requirements of DOT's rules "regarding accessibility of transportation services, does not release federal fund recipients from compliance with subpart C's requirements regarding the accessibility of transportation facilities." 833 F.2d at 1118.
 Of course, if a transit system chooses not to purchase any new buses, it need not comply with anything in subpart C, and in that event need only comply with the service requirements of subpart E. However, subpart E cannot, as it purports to do, vitiate by implication subpart C's independent requirement, promulgated by DOT in 1979 and still in effect, that federal assistance for new bus purchases be spent on accessible facilities.
 Thus, contrary to the lower court's holding, Sec. 504's plain language, its legislative history, the caselaw construing it, and the administrative construction of DOT itself all support the requirement that when new vehicles are purchased with DOT assistance, they must be accessible.
 Id. at 28-29 (emphasis added).
 The only other Subpart C reference by ADAPT in its main brief cited by the plurality is ADAPT's remark included above that if local transit authorities do not purchase new buses, they need not comply with Subpart C. Opinion at 1197. The plurality seems to view this sentence as a concession as to Subpart C's applicability, when it is merely a statement of the obvious.
 Again, in its reply brief to this court, ADAPT aggressively reiterates its Subpart C position. Although the plurality notes the presence of the argument in the reply brief, it shortchanges the amount of pages in the brief outlining the argument. While the plurality concedes that a two-page discussion is included, the argument actually spans five pages. I spare the reader further quotation; suffice it to say that the Subpart C argument is an integral component of the brief. ADAPT Reply Br. 16-20.
 I also note that DOT found it necessary to respond to the implications of Subpart C in its main brief to us, DOT Br. at 27-28, n. 6, the merits of which I later discuss. Diss.Op. (Mansmann), at 1213.
 Finally, on rehearing this case at oral argument, Judge Becker asked the parties to respond to whether the issue of the interplay between Subparts C and E had been raised before the district court. ADAPT claimed that the issue of Subpart C was presented to the district court through its pleading of Sec. 504. ADAPT then explained that Sykes was not decided until after the complaint was filed and that is the reason why the import of C was not previously stressed.
 More telling was DOT's answer to Judge Becker's questioning. Initially, DOT informed Judge Becker that his point that the effect of Subpart C of the rule was not before the district court might be a fair interpretation of the district court proceedings. This response was severely undercut, if not completely abrogated, however, by a subsequent assertion by DOT. When Judge Becker asked DOT why the court could not decide this matter without any reference to Subpart C, DOT countered that such a resolution was not acceptable because the interplay between C and E was a question of law, critical to the outcome of the case.
 
 
 [9]
 I do not today depart in any fashion from our prior holding in Sykes. To the contrary, as in Sykes, I am relying on the precise requirements of the DOT's regulations, i.e., Subpart C's crystal-clear mandate that newly purchased buses be accessible
 
 
 [10]
 I am aware that the regulations at issue in Sykes are not identical to the ones at issue today and I caution that I am not relying on Sykes in the context of issue preclusion. I, instead, utilize the language in Sykes as demonstrating that services and facilities represent two distinct areas to be evaluated
 
 
 [1]
 See Opinion at 1200-01. Judge Mansmann also agrees with this point, see Diss.Op. (Mansmann) at 1203, and so it appears that the court unanimously supports the view that the Secretary has the authority to establish a safe harbor provision that is expressed in terms of a percentage of operating costs. But cf. Opinion at 1203 n. 15 (stating that the plurality did "not reach the issue of whether some other safe harbor provision would be permitted by the STAA.")
 
 
 [2]
 I also note that at oral argument counsel for the Secretary informed the court that the applicability of the Federal-Aid Highway Act is much narrower than the other statutes analyzed by the plurality
 There is a lot of reliance placed on the Federal-Aid Highway Act. I am sorry to tell the court that that statute will not be of much use in resolving the issues of this case. Whatever it means it only applies to assistance that is granted under Federal-Aid Highway Act programs. That is a very small percentage of the transit assistance that is at issue here. Most of the money for bus purchases comes under different statutory provisions that are not in any way controlled by the Federal-Aid Highway Act provision. To give some idea of the scale that we're talking about there was a total under the Federal-Aid Highway Act in fiscal year 1988 of $140 million obligated. Only $20 million of that went to bus services. Transit assistance programs totaled $3.4 billion in obligations. $20 million, to give you another reference point, would buy only on the order of 140 buses. Obviously, the are far more buses--many more buses purchased. They're not under that statute.
 Accepting these figures as true, it appears that even if the Federal-Aid Highway Act required mainstreaming, an interpretation that I do not accept, at most 1/160th of the funds from federal transit assistance programs would have to be spent on accessible buses. Consequently, the Federal-Aid Highway Act cannot support a broad requirement that transit authorities purchase only accessible buses.
 
 
 [3]
 As Judge Seitz recently wrote, "an agency interpretation of its own regulation is 'of controlling weight unless it is plainly erroneous or inconsistent with the regulation.' " Pennsylvania v. F.E.R.C., 868 F.2d 592, 596 (3d Cir.1989) (citing Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945) and Mullins Coal Co. v. Director, 484 U.S. 135, 159, 108 S.Ct. 427, 440, 98 L.Ed.2d 450 (1987))
 
 
 [4]
 Inasmuch as this position was taken by the Secretary on the rulemaking record, I cannot join in the plurality's characterization of this as a "litigation position," Opinion at 1198, only
 
 
 [5]
 Since this court's November 23, 1987, decision in Sykes, 833 F.2d 1113, opened the door to the argument that different subparts of the transit regulations could impose independent and cumulative obligations, counsel for all parties have framed their arguments as though the relationship of Subpart C and Subpart E is an integral part of this case. No party has suggested that this issue is not properly before this court and counsel for the plaintiffs opened his remarks at the in banc oral argument stating, "[t]he question I'll address [is] whether a transit system purchasing a brand new bus, 80% of which is paid for by federal assistance, must purchase an accessible bus." See also In re Watts, 876 F.2d 1090, 1095 n. 8 (3d Cir.1989)
 
 
 [6]
 For example, to the extent such services are provided to "non-disabled elderly persons or mentally handicapped individuals," 49 C.F.R. Subpart E app. at 296 (1988), the expenses attributable to these services do not count toward the minimum expenditure sufficient to shelter the transit operator in the safe harbor. Likewise, the Secretary has stated that "[i]f, because the recipient has a reasonable, nondiscriminatory policy against permitting very young children to ride buses unaccompanied, or because such children cannot read destination signs, such individuals cannot use the bus system, these facts do not make them eligible to use [paratransit as an expense cognizable under Sec. 27.99]." Id. at 297
 
 
 [7]
 I also note that although the regulations provide that only "expenditures by the recipient of its own funds", 49 C.F.R. Sec. 29.99 (1988), are eligible expenses, thus suggesting that the expenditure of funds from federal or other governmental sources are not eligible expenses, the appendix to Subpart E clarifies that the expenditure of at least certain federal funds are considered eligible expenses. Following the phrase "an expenditure by the recipient of its own funds," the appendix adds the parenthetical phrase "including the UMTA assistance it receives." 49 C.F.R. Subpart E app. at 302 (1988)
 
 
 [8]
 The figures used in my hypothetical provide a conservative estimate when compared to the figures supplied by the plaintiffs' counsel at oral argument. Mr. Cook informed the court that only 5-7% of the capital cost and less than 1% of the operating cost of an accessible bus is attributable to its extra features, and that the buses have a 12 year lifespan
 
 
 [9]
 Although 49 C.F.R. Sec. 27.95(b) (1988) and 49 C.F.R. Sec. 27.95(c) (1988) set forth "minimum service criteria", these same substantive standards are described as the "full performance level" in 49 C.F.R. Secs. 27.81 (incorporating by reference 49 C.F.R. Sec. 27.95), 27.87 (same), 27.89, 27.95(a) (1988) and the appendix to Subpart E. As the Secretary and this court interpret the substantive standards, however, they specify neither minimum nor full levels of service for the mobility impaired. In part, the plurality's unwillingness to accept the 3% figure as a safe harbor may be related to erroneously characterizing the substantive standards as literally "minimum service criteria". See 51 Fed.Reg. 18,996 (1986)
 
 
 [10]
 DOT explained that "predictability is important in planning and budgeting for any public expenditure. The [safe harbor] provision will ensure that recipients know, and can plan on the basis of, a predictable limit to their cost exposure for compliance with [Subpart E]." 51 Fed.Reg. 19,011 (1986)
 
 
 [11]
 A fleet of this description would presumably be sufficient to meet the minimum service criteria of 49 C.F.R. Sec. 27.95(c) (1988) which requires that sufficient accessible buses be in use during the same hours and over the same service area as regular bus service so as to be available at "reasonable intervals." With a fleet in which half the fleet was accessible, buses could be scheduled so that every other bus on a given route was accessible
 A transit operator with such a fleet, however, would not be permitted to maintain this proportion under the plurality's dicta. Under the plurality's view, as a transit operator replaced buses it would have to purchase only accessible buses regardless of the proportion of accessible to inaccessible buses represented in its fleet.
 
 
 [12]
 As the Secretary explained in his brief, recipients of federal assistance under the Urban Mass Transportation Act are required to make "fair and equitable arrangements to protect the interests of employees affected by federal mass transit assistance." Brief for James Burnley, Secretary of the United States Department of Transportation at 44 (citing 49 U.S.C.App. Sec. 1609(c)). As a result, federal law "prevent[s] federal funds from being used to destroy the collective-bargaining rights of organized workers." See id. (citing Jackson Transit Auth. v. Local Division 1285, Amalgamated Transit Union, 457 U.S. 15, 16, 102 S.Ct. 2202, 2203, 72 L.Ed.2d 639 (1982)). Against this background, it appears that a paratransit system operated by the recipient has a higher cost because "a transit authority operating its own paratransit service may not be free to unilaterally contract the service out to a private provider; the transit operator must instead negotiate satisfactory labor protection provisions for potentially adversely affected employees." Id. at 44-45
 
 
 [13]
 I note that the plurality's conclusion that the safe harbor is arbitrary because small communities will rely on the safe harbor rather than spend the greater sums required to operate a recipient-run paratransit system is incorrect to the extent that this argument encompasses communities with populations of less than 50,000. By reading 49 C.F.R. Sec. 27.97 (1988) in isolation the plurality overlooks the fact that these small communities cannot use the safe harbor provision for the reason that they are expressly exempted from complying with the minimum service criteria of 49 C.F.R. Sec. 27.95 (1988) to which the safe harbor applies. Separate regulations govern these communities. See 49 C.F.R. Sec. 27.91 (1988)
 The logical result of the plurality's position would be the invalidation of that portion of Subpart E that exempts these small communities from compliance with the substantive standards and substitutes less strict requirements. At no point in this case, however, has anyone suggested that 49 C.F.R. Sec. 27.91 (1988) is invalid. Nor would I invalidate that regulation because I cannot conclude that the Secretary does not have discretion to formulate standards that recognize the principle of economies of scale. Nor can I conclude that the Secretary does not have discretion to produce separate standards for urban and rural areas.
 
 
 [14]
 I find the plurality's willingness to speculate that the Secretary will apply these regulations in a manner inconsistent with legislative dictates surprising in view of the plurality's unwillingness to assume the manner of the Secretary's application of Subpart C of the regulations with regard to the same statutory mandates. See Opinion at 1198
 
 
 [15]
 The other case on which the plurality relies, Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962), involved a challenge to an administrative order issued by the Interstate Commerce Commission (ICC). Specifically, Short Line filed applications with the ICC for common carrier authority to transport commodities on a regularly scheduled basis between certain points and for operating authority on irregular routes. See id. at 160-61, 83 S.Ct. at 242. Short Line requested this authorization because a secondary boycott by the unionized employees of common carriers serving its area had interrupted usual service
 The ICC partially granted the first application for a certificate of public convenience and necessity. Competing carriers and the labor union which represented employees of the competing carriers brought suit. The Supreme Court reviewed the ICC's issuance of the certificate within the factual context of Short Line's application and the surrounding labor dispute. See id. 166, 170 n. 20, 83 S.Ct. at 244, 247 n. 20. In reversing the district court's validation of the ICC's action, the Supreme Court stated:
 This is not to say that circumstances can never permit the Commission to authorize additional service to remedy refusals to serve, but the Commission must act with a discriminating awareness of the consequences of its action. It has not done so here.
 Id. at 176, 83 S.Ct. at 249.
 Thus Burlington Truck Lines presented an "as applied" challenge to an exercise of power under applicable law rather than a facial challenge to any regulation of general application. Accordingly, the Supreme Court invalidated the order of the ICC granting the certificate of public convenience and necessity but, unlike the plurality here, the Court did not invalidate any regulation.
 
 
 [16]
 The plurality attempts to avoid the implications of this analysis by framing the issue in terms of the congressional mandate of section 317(c) that DOT establish "minimum service criteria", Opinion at 1203, but I note that the Secretary considered and rejected that argument, see 51 Fed.Reg. 18,998 (1986), and that Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 n. 11, 104 S.Ct. 2778, 2782 n. 11, 81 L.Ed.2d 694 (1984), counsels greater deference to the Secretary's interpretation of his task in framing these regulations